**The GAULEY MOUNTAIN COAL COM-
PANY (Williams River No. 1
Mine), Appellant,**

v.

**DIRECTOR OF THE UNITED STATES
BUREAU OF MINES, Appellee.**

No. 6990.

United States Court of Appeals
Fourth Circuit.

Argued June 15, 1955.

Decided July 30, 1955.

Jerome Powell, Washington, D. C.
(William F. Howe and Gall, Lane &
Howe, Washington, D. C., on brief), for
appellant.

John G. Laughlin, Sp. Asst. to Atty.
Gen. (Warren E. Burger, Asst. Atty.
Gen., and Melvin Richter, Attorney, De-
partment of Justice, Washington, D. C.,
on brief), for appellee.

Before PARKER, Chief Judge, and
SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal by the Gauley Moun-
tain Coal Company, under sec. 208 of the
Act of July 16, 1952, 66 Stat. 702, 30
U.S.C.A. 478, seeking review of an order
of an inspector of the United States Bu-

reau of Mines, closing a portion of its Williams River No. 1 Mine at Cowen, W. Va., because of failure to comply with the requirements of section 209(d) (9) of the Act, 30 U.S.C.A. § 479(d) (9). That section requires certain precautions before the operation of electrically driven equipment in a "gassy" mine.[1] Section 209(b) classifies as a "gassy" mine within the meaning of the Act any mine found to be "a gassy or gaseous mine pursuant to and in accordance with the law of the State in which it is located".[2] The mine in question had been so classified by the West Virginia Department of Mines pursuant to certain bore hole tests.

■ Appellant admits the operation of the electrically driven machinery without complying with the requirements of section 209(d) (9), but contends that the mine was not a gassy mine and that the bore hole tests were not in accordance with West Virginia law. The Board held that it was without power to review the classification made by the state authorities as to the gaseous nature of the mine, and that any review as to such finding must be sought under state law from state tribunals. Appellant contends that, if the act be so construed, it violates provisions of the federal Constitution. Two questions are presented by the appeal: (1) Did the Board have power under the act to re-examine the question as to whether the mine was a gaseous mine, after a finding as to that matter by the state authorities? And (2), if not, was the statute thereby rendered unconstitutional and void as to the provisions here involved? We think that the Board correctly answered both of these questions in the negative.

The law of West Virginia creates a Department of Mines, provides for inspection of mines by mine inspectors, directs how "gassy" mines shall be operated and how electrically driven machinery may be used therein, and provides for review by the courts of the state of orders made by the Department of Mines. Code of West Virginia 1949, ch. 22, art. 1, secs. 2367–2368, art. 2, secs. 2384–2444 (22–1–1, 22–1–2, 22–2–5 to 22–2–65). Algoma Coal & Coke Co. v. Alexander, 136 W.Va. 521, 66 S.E.2d 201; Pond Creek Pocahontas Co. v. Alexander, 137 W.Va. 864, 74 S.E.2d 590, appeal dismissed 346 U.S. 803, 74 S.Ct. 36, 98 L.Ed. 334. In 1939 the chief of the Department of Mines established standards for classification of mines under which any mine is to be classified as a "gassy" mine where any quantity of methane can be detected in the air or where 5 per cent of methane or more can be detected in a shot hole or crevice on different days. This bore hole test has been in use in West Virginia since 1939. In application thereof, the mine here was classified as a gaseous mine and appellant was so notified on December 17, 1953. Appellant took no steps to have this action reviewed by the state authorities and did not comply with the requirements of sec. 209(d) (9) of the federal act with respect to electrically operated machinery in a gaseous mine, but, when the closing order was entered more than a year later for failure to comply with that section, sought to have the Board set aside the classification made by the State Department of Mines.

■ We agree with the Board that it was never intended by the statute that the Board should review or set aside or-

[1] "In all underground face workings in a gassy mine where electrically driven equipment is operated, examinations for methane shall be made with a permissible flame safety lamp by a person trained in the use of such lamp before such equipment is taken into or operated in face regions, and frequent examinations for methane shall be made during such operations."

[2] "Every operator of a mine which, on or after the effective date of this title, is, or

which, immediately prior to the effective date of this title, was defined, classed, classified as, or determined, deemed, judged, held, or found to be, a gassy or gaseous mine pursuant to and in accordance with the laws of the State in which it is located, and every operator of a mine which, immediately prior to the effective date of this title, was operated as a gassy mine, shall comply with the provisions of this section which pertain to gassy mines."

ders of the state authorities classifying mines as gaseous. Cf. Davies Warehouse Co. v. Bowles, 321 U.S. 144, 151–152, 64 S.Ct. 474, 88 L.Ed. 635. The purpose of the statute, as clearly appears from the Report of the Senate Committee having it under consideration, Senate Report No. 1223, 82nd Cong., 2d Sess., U.S.Code Congressional and Administrative News 1952, vol. 2, p. 2221 et seq., was to superimpose federal regulation on state regulation without interfering in any way with the latter; and for the Board to review or set aside orders of the state authorities with respect to the classification of mines as gaseous or nongaseous would manifestly breed the worst sort of confusion in the administration of a safety measure which is of the gravest public concern. As was well said in the opinion of the Board:

> "The statutory purpose of section 209(b) is readily apparent from a reading of the act. Congress intended by this section that the safeguards in section 209 pertaining to gassy mines be applied immediately and uniformly to mines already operated as gassy, and to mines classed as gassy or gaseous for State purposes. The reference to State laws in this connection relates simply to the nature of the ultimate State classification of the mine. If the mine was characterized for State purposes as "gassy or gaseous," then a like status was to be immediately accorded the mine under the federal act. Neither the terms of the act nor its legislative history suggest any design by Congress to create a new tribunal to sit in judgment on the actions of *State* authorities in the execution *of their own State Laws*."

The Report of the House Committee, H. Report No. 2368 82d Cong. 2d Sess., has the following to say with respect to the meaning of sec. 209(b) of the Act:

> "*Subsection (b)—Gassy mines.—* This subsection provides that every operator of a mine which, on or after the effective date of this title, is, or which immediately prior to the effective date of this title, was, defined, classed, classified as, or determined, deemed, judged, or found to be, a gassy mine under the laws of the State in which it is located, * * * shall comply with the provisions of this section which pertain to gassy mines. This subsection is intended to make it clear that mines which have been determined to be gassy mines under State law, * * * shall be operated as gassy mines in accordance with the provisions pertaining to such mines as contained in this section."

This does not mean, of course, that appellant is without a remedy if its mine is improperly classified as gassy or gaseous by state authorities; but the remedy is to appeal to the tribunals set up by state law to correct the classification. Cf. Alabama Public Service Comm'n v. Southern Ry. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002; Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424. The federal statute provides remedies to be applied in addition to state remedies to conditions found to exist by state agencies, and, if the determination of such an agency is to be questioned, this should be done in the manner provided by state law. So long as the action of the agency stands, it constitutes classification under the law of the state, which furnishes the basis for the application of the federal statute. In this respect the statute here is not unlike that authorizing deportation of an alien upon conviction of crimes under state law, where it is held that conviction under state law is conclusive for purposes of the deportation statute. United States ex rel. Meyer v. Day, 2 Cir., 54 F. 2d 336. Cf. Pino v. Landon, 349 U.S. 901, 75 S.Ct. 576.

Appellant contends that 207(g) of the act, 30 U.S.C.A. § 477(g), authorizes the Board to determine whether or not there has been a violation of section 209 at the time of the making of the order. So it does, but it does not follow that the Board is thereby empowered to re-

view the classification made by the state agency. Violation of the order was unquestionably shown, where it appeared that electrically driven machinery was operated, without compliance with the provisions of sec. 209(d) (9), in what the statute defined for its purposes as a gassy mine.

■ We see nothing in this violative of any principle of the federal Constitution. There is no delegation by Congress of its own power to a state agency, but merely the acceptance by Congress of state action as the condition upon which its exercise of power is to become effective. Congress has done this in a number of other fields of the law. The Federal Tort Claims Act, for example, bases liability under the act upon standards established by state law. 28 U.S.C. § 1346 (b). Federal grants in aid to the states under the Social Security Act are dependent upon state unemployment compensation laws and state old age assistance plans. 42 U.S.C.A. §§ 301 and 501. The Bankruptcy Act draws upon state law for many matters affecting priorities and the validity of liens and state law is relied upon for approval of compositions by state governmental agencies in chapter X proceedings (now chapter 9, 11 U.S.C.A. § 401 et seq.). United States v. Bekins, 304 U.S. 27, 49, 58 S.Ct. 811, 82 L.Ed. 1137. The Assimilative Crimes Act, R.S. § 5391, 18 U.S.C. § 13, makes applicable state and territorial criminal laws to areas under federal jurisdiction located in a state or territory; and this has been held valid against a contention that it amounts to a delegation of legislative power. Franklin v. United States, 216 U.S. 559, 30 S.Ct. 434, 54 L.Ed. 615. Action by state courts is necessary to guilt under the federal Fugitives from Justice Act 18 U.S.C. § 1073. Hemans v. United States, 6 Cir., 163 F.2d 228, 238 et seq. And state indexing and recording acts are adopted by the federal statute as determinative of the lien of judgments of federal courts. 28 U.S.C. § 1962. The Johnson Act, 15 U.S.C.A. §§ 1171–1177, relating to transportation of gambling devices, provides that a state may by law exempt itself from the provisions of the act, thus making the application of the act of Congress dependent upon state action. See Nilva v. United States, 8 Cir., 212 F.2d 115, certiorari denied 348 U.S. 825, 75 S.Ct. 40, rehearing denied 348 U.S. 889, 75 S.Ct. 203. The Connally Hot Oil Act, 15 U.S.C.A. § 715 et seq., is one under which the federal government is cooperating with the several states in the enforcement of a policy for the conservation of natural resources. The applicability of that act is dependent upon the existence of state conservation laws, just as the applicability of the statute here is dependent upon state action; but it is held that this is not a delegation of legislative power by Congress. Humble Oil & Refining Co. v. United States, 10 Cir., 198 F.2d 753, certiorari denied 344 U.S. 909, 73 S.Ct. 328, 97 L.Ed. 701; Griswold v. The President of the United States, 5 Cir., 82 F.2d 922, 923. In the case last cited, Judge Hutcheson uses language which is appropriate here. Referring to the Connally Hot Oil Act, he said:

"It takes up where state power ends, and by supplementing state legislation it makes completely effective the general will of the people of the state of Texas, expressed in its conservation laws. Congress has validly done this same thing in connection with the transportation into dry states, of intoxicating liquor, Clark Distilling Co. v. Western Maryland Ry. Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A. 1917 B, 1218, Ann.Cas.1917B, 845; into states which prohibit such goods, or goods made by convict labor, Whitfield v. State of Ohio, 297 U.S. 431, 56 S.Ct. 532, 80 L.Ed. 778. It has done it as to the transportation out of states of birds or wild game killed there contrary to its laws, Bogle v. White, 5 Cir., 61 F.2d 930; and as to motorcars stolen in violation of state laws, Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407."

In Clark Distilling Co. v. Western Maryland Ry. Co., 242 U.S. 311, 37 S.Ct. 180, 185, 61 L.Ed. 326, which upheld the constitutionality of the Webb-Kenyon Act, 27 U.S.C.A. § 122, against the contention that it involved the delegation by Congress of legislative power, the Supreme Court, speaking through Chief Justice White, said:

"The argument as to delegation to the states rests upon a mere misconception. It is true the regulation which the Webb-Kenyon Act contains permits state prohibitions to apply to movements of liquor from one state into another, but the will which causes the prohibitions to be applicable is that of Congress, since the application of state prohibitions would cease the instant the act of Congress ceased to apply. * * * So far as uniformity is concerned, there is no question that the act uniformly applies to the conditions which call its provisions into play,— that its provisions apply to all the states,—so that the question really is a complaint as to the want of uniform existence of things to which the act applies, and not to an absence of uniformity in the act itself. But, aside from this it is obvious that the argument seeks to engraft upon the Constitution a restriction not found in it; that is, that the power to regulate conferred upon Congress obtains subject to the requirement that regulations enacted shall be uniform throughout the United States. In view of the conceded power on the part of Congress to prohibit the movement of intoxicants in interstate commerce, we cannot admit that because it did not exert its authority to the full limit, but simply regulated to the extent of permitting the prohibitions in one state to prevent the use of interstate commerce to ship liquor from another state, Congress exceeded its authority to regulate."

In the case at bar the regulations prescribed by Congress with respect to gaseous mines become effective upon a determination by a state agency under state law. That determination is not made under the authority of Congress. Congress merely applies its regulation of interstate commerce in aid of state regulation after the state has classified the mine as subject to regulation as a gaseous mine. In the light of the authorities cited, this is clearly not delegation of Congressional power to the states; and, with this out of the way, there is not enough in the due process and lack of standards argument to warrant discussion. Granting the propriety of adopting a state classification as the basis for application of the federal regulation, there is nothing in the regulation itself which could possibly offend the due process clause and due process with respect to the state classification is preserved in the right to have this reviewed by state tribunals. Cf. Yakus v. United States, 321 U.S. 414, 434, 64 S.Ct. 660, 88 L.Ed. 834. Since there was no delegation of power by Congress in the matter of classification, it was not necessary that Congress prescribe standards to govern the exercise of that power since it was not concerned with the matter of separation of powers as applied to state action.

Counsel for appellant have exhausted the standard constitutional arguments in an effort to have this statute held invalid or given an interpretation which would virtually emasculate it. The case as thus presented seems complicated, but in reality it is a simple one. After half a century of heart breaking experience with state regulation of coal mining, in which the safety regulations by the states have not been adequately enforced, Congress has entered the field following a shocking mine disaster which has aroused the conscience of the nation. In the action taken, Congress has sought, not to displace state regulation, but to leave it unimpaired and to superimpose federal regulation thereon. Operation of gaseous mines is one of the chief sources of danger with which Congress seeks to deal; and with this it does not interfere

892

with state classification or state regulation but provides merely that, when a mine has been classified as gaseous by a state, the federal regulations applicable to gaseous mines shall apply to it. There is no reason in constitutional law or in common sense, why such cooperative approach to the problem of regulation by the state and federal governments should be held invalid, or why the federal agency should review a classification which the state agency has made. If there is dissatisfaction with such classification, correction should be sought at the hands of the tribunals of the state which have made the classification, not at the hands of the agency of the federal government which merely applies an admittedly valid regulation to the state classification.

The order of the Board will be affirmed.

Affirmed.