**DIRECTOR, UNITED STATES BUREAU OF MINES, Appellant,**

v.

**PRINCESS ELKHORN COAL COMPANY (Princess No. 2 Mine), (Federal Coal Mine Safety Board) Appellee.**

No. 12452.

United States Court of Appeals Sixth Circuit.

Oct. 24, 1955.

John G. Laughlin, Washington, D. C., argued Warren E. Burger, Asst. Atty. Gen., Melvin Richter, John G. Laughlin, Dept. of Justice, Donald G. Welsh, Dept. of Interior, on the brief, for appellant.

John K. Pickens, Jerry N. Griffin, M. Joseph Stoutenburgh and John C. Gall, Washington, D. C., on the brief, Dawson, Griffin, Pickens & Bird, Gall, Lane & Howe, Washington, D. C., of counsel, for appellee.

Welly K. Hopkins, Harrison Combs, Willard P. Owens, Washington, D. C., on the brief, amicus curiae, for United Mine Workers of America.

Ed D. Schorr, Columbus, Ohio, Louis J. Schneider, Jr., Cincinnati, Ohio, on the brief, amicus curiae, for Operators & Committee on Federal Mine Safety Legislation.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

This is an appeal by the Director of the United States Bureau of Mines from a decision and order of the Federal Coal Mine Safety Board of Review. The Safety Board directed annulment of an order of the Director which denied application of the appellee company for the voiding of an order issued by a federal inspector, pursuant to section 203(d) of the Federal Coal Mine Safety Act [30 U.S.C.A. §§ 451–483], requiring the appellee operator of Princess No. 2 Mine to comply with the provisions of section 209 of the Act pertaining to gassy mines.

The decision of the Safety Board of Review was reached by a two to one vote. Both the majority opinion and the dissenting opinion set forth in excellent fashion the conflicting views of the members of the board. It would suffice to rest decision of this court upon the opinion in which we concur, except for the fact that the Federal Coal Mine Safety Board's decisions are not included in the Federal Reporter system.

In addition to two briefs filed by each of the contending parties, an amicus curiae brief has been filed by the United Mine Workers of America and, likewise, one by the Operators' Committee on federal mine safety legislation. After due consideration of the briefs and oral arguments of attorneys, and after our study of the entire record in the case, we have reached the conclusion that the majority opinion of the Federal Coal Mine Safety Board of Review should be upheld.

The issue presented is whether the Federal Coal Mine Safety Inspector, who took a sample from the Princess No. 2 Mine upon the basis of which the mine was classified as gassy, complied with section 203(d) of the Act: "If a duly authorized representative of the Bureau, upon making an inspection of a mine, as authorized in section 202, finds that methane has been ignited in such mine or finds methane by use of a permissible flame safety lamp or by air analysis in an amount of 0.25 per centum or more in any open workings of such mine when tested at a point not less than twelve inches from the roof, face, or rib, * *."

The appellant insists that he did comply; the appellee contends that he did not, in that the sample of mine atmosphere was taken within twelve inches of freshly cut machine cuttings. The Federal Coal Mine Inspector who took the sample on August 31, 1954, reported some two weeks later that 0.27 per centum of methane gas had been found in the Princess No. 2 Mine and ordered appellee, Princess Elkhorn Coal Company, to comply with the provisions of section 209 of the Federal Coal Mine Safety Act with relation to the operation of gassy mines.

On appeal by the company, the Director of the United States Bureau of Mines denied annulment of the inspector's order, upon a finding that the sample of mine atmosphere taken by the inspector had been collected in accordance with the provisions of section 203(d) of the Act; that the chemical analysis of the sample had been made in a proper and accurate manner; and that methane was found in open workings of the mine in an amount of 0.25 per centum, or more.

The Safety Board held that the air sample was not taken by the mine inspector in accordance with provisions of section 203(d) of the Act. This conclusion was reached after a full hearing by the Board upon application of the appellee for annulment of the Director's order. In its decision, the Board majority entered findings of fact based upon the entire record in the case and upon "observation of the witnesses." These findings of fact will be summarized, with omission of unnecessary details.

Federal Coal Mine Inspector Meadows made an inspection of the Princess No. 2 Mine on August 31, 1954. He was accompanied by the Safety Director of the appellee company. He took a sample of the mine atmosphere in a bottle which was placed in a fibre container and mailed to the gas analysis laboratory of the Bureau at Pittsburgh, Pennsylvania, where it was received on September 7, 1954. On the basis of the analytical report from the laboratory, the mine inspector issued a notice and order dated September 16, 1954, requiring the operator of the mine to comply with the provisions of section 209 of the Act, which pertained to gassy mines. The Board found upon substantial evidence that the sample of mine atmosphere analyzed was taken at approximately ten o'clock in the morning, in the No. 2 Pillar, No. 55 section, of the mine, at a place which had been under-cut and drilled some ten or fifteen minutes before the inspector and the Safety Director entered the room. Nelson, a machine operator, and his helper had just finished drilling and were in process of securing the drill on the cutting machine.

Spears, the company's safety director, testified that he and Inspector Meadows approached the solid coal which had been under-cut and drilled; that Meadows made a right angle with a folding rule, each leg of which was twelve inches long, the point of one leg being placed against the roof and the point of the other leg against the solid coal. Spears held the rule in that position while Meadows held the bottle outside the right angle formed by the two legs of the rule in a position below the horizontal leg and outside the vertical leg in relation to the solid face. In this position, the tip of the bottle, when broken, was approximately thirteen or fourteen inches from the roof and the same distance from the solid coal. The distance to the rib was more than twelve inches, the sample having been taken about half way between the ribs. The room was about twenty-six feet wide.

After breaking off the tip, the mine inspector sealed the bottle by placing over the neck a small, wax-filled cap. The machine cuttings, or "bug dust", created by the under-cutting and drilling of the solid coal, were still in place when the sample was taken. The mine inspector was unable to state how close the sample was taken to the machine cuttings; but Spears testified positively that *the sample was taken approximately six inches above the mound of the machine cuttings*. He testified, further, that the machine cuttings extended in a mound starting against the solid face for about four feet back into the room; that the highest point in the mound was some twenty inches back from the solid coal; and that the air sample had been taken slightly toward the solid coal from the peak of the mound. The testimony of Spears was not contradicted by Inspector Meadows.

It appears that a cutting machine of the kind and type used in the Princess No. 2 Mine would normally throw up a mound of machine cuttings across almost the entire face area of the working place. The coal seam in the mine is about thirty-

six inches high. The majority decision rejected the argument of the company that the term "methane", as used in the Act, must be interpreted to mean "chemically pure methane ($CH_4$)." The Board also rejected the argument of the company that "the mine inspector did not make a personal determination that the required amount of methane in fact existed in the applicant's mine, as required by the statute." It was declared to be obvious that to interpret the statute as requiring the inspector to make his own personal analysis would, in effect, vitiate the Act.

Stating that the sample analyzed had been taken more than twelve inches from the roof, rib, and solid coal, but only approximately six inches above the freshly-cut machine cuttings, the majority opinion asserted the problem presented to be whether it is proper under the statute to take a sample of mine atmosphere less than twelve inches from freshly-cut machine cuttings for the purpose of determining whether a mine should be given a gassy classification. The position of the Bureau was said to be that the term "face", as used in the pertinent section of the statute, must be interpreted to mean "solid face", while that of the appellee company is that the term "face", as used in the applicable section of the Act [203(d)], is a general term including various types of coal faces and that it would be unreasonable and unrealistic to adopt the narrow interpretation of "solid face" urged by the Bureau of Mines.

In support of its position, the appellee company introduced the testimony of qualified experts, Hyslop, Crawford and Mosgrove. The general tenor of their testimony was that, in mining parlance, the term "face" has various meanings, such as face of solid coal, face of machine cuttings, face of shot coal, or face of other coal, depending upon the particular circumstances. Hyslop added that it is customary in referring to solid coal to use the expression "solid face."

Pointing out that H. R. 7408, which later became the Act under interpretation, was finally drafted in committee and enacted by Congress with the additional requirement that a sample for air analysis must be taken not less than twelve inches from the roof, face or rib, the Board reasoned that Congress must have felt that a sample of mine atmosphere would not be representative, unless it was so taken. Indeed, the Director, himself, as well as Hyslop and Mosgrove, so conjectured. The majority opinion of the Board of Review stated: "We do not believe that the Congress, in setting up requirements aimed at securing *a representative sample of mine atmosphere,* intended that an inspector should stay away from solid coal twelve or more inches and then permit him to take a sample directly over or even in loose coal or machine cuttings which the evidence shows liberates more methane than coal which has been fractured." The Board reasoned further that if an inspector were permitted to take an air sample within twelve inches of machine cuttings or shot coal, virtually every mine in the United States would be classified as gassy; and that Congress manifestly did not intend that the word "face" should be accorded a definition which would render pointless the insertion of the provisions relating to non-gassy mines and, in practical effect, eliminate those provisions from the Act.

The Board declared: "Our interpretation of 'face' to require that the air sample be taken at least twelve inches from the shot coal or loose coal, as well as solid coal does not in any manner whatsoever increase the danger of explosion sought to be avoided by the Act. Congress established a 12-inch rule because a sample closer to various coal surfaces would not be representative of the air in open workings, and a showing of more than 0.25 per centum of methane within the 12-inch area would *not* reflect any danger of explosion to the workers." The Board reasoned logically, further, to the end that the twelve-inch limitation in the Act, as construed by it, would result in the uniform application of the Act to coal mines, whether having high or low

coal seams. The majority members of the Board said that, in their carefully considered opinion and in the light of their extensive past experience, they believed and found that their interpretation of the word "face" to include coal, whether loose or solid, would not interfere with but would effectuate the basic purposes of the Act. They asserted their conclusion that the Bureau had not taken the air sample in compliance with section 203(d) of the Act.

The dissenting member of the Board vigorously asserted that the majority decision is contrary to the clear intent of Congress and perpetuates the very danger of explosion which the Act was designed to eliminate. He said that the meaning of the word "face" as established in the mining industry for generations implies simply the "solid block of coal in the advancing working place"; and that when Congress used the word in the Act the lawmakers intended that it should have this meaning. He pointed out that, under the majority interpretation of the word "face", in 138 mines in the United States which in 1950 had seams of 24 inches or less the miners will in effect be condemned without statutory recourse to the dangers of gas explosions because no sample can be taken in the working area. He said further that, in mines having coal seams from 24 to 48 inches, the definition adopted by the majority would prevent an adequate sampling of mine air except during the very brief period between the end of one production cycle and the beginning of the next. He argued further that to require an inspector to await a clearing of an entire area by shoveling or scraping is unrealistic, would be extremely time-consuming and impractical; and that the scraping or shoveling would create an artificial ventilating current which, of itself, would prevent adequate sampling of the working area. He concluded that the air sample taken by the inspector in the instant case complied with the language and purpose of 203(d) of the Act and that, therefore, the order of the Director should not be annulled.

■■ Concededly, all three members of the Board are thoroughly expert in the field of coal mining. Moreover, the witnesses who testified as experts in the case were well qualified as such. The matter presented for decision here falls clearly within the doctrine of expertness promulgated in opinions of the Supreme Court. The members of the Federal Coal Mine Safety Board of Review are much better qualified than are the members of this court to interpret the meaning of the word "face" as used in the Act, in the context of the facts found by the Board. We think the conclusions of the majority of the Board are reached upon sound reasoning and rest upon a "rational basis" and upon " 'warrant in the record.' " See National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 131, 135, 64 S.Ct. 851, 861, 88 L.Ed. 1170.

In Order of Railway Conductors of America v. Swan, 329 U.S. 520, 525, 67 S. Ct. 405, 408, 91 L.Ed. 471, it was said that, in the absence of statutory definition of a technical term found only in railroad parlance, "evidence as to the meaning attached to it by those who are familiar with such parlance therefore becomes relevant in determining the meaning of the term as used by Congress." O'Hara v. Luckenbach S. S. Co., 269 U.S. 364, 370–371, 46 S.Ct. 157, 159, 70 L.Ed. 313, was cited. There, it was held that the phrase " 'divided into * * * watches' " should, in construing the Seamen's Act, 46 U.S.C.A. § 673, be given the meaning which it had acquired in the language and usage of the nautical trade.

The conclusions of the Board, in our judgment, were correctly drawn; and the order of the Federal Coal Mine Safety Board of Review from which this appeal is taken is, therefore, affirmed.