**ROSEDALE COAL COMPANY (Rosedale No. 8 Mine), Appellant,**

v.

**DIRECTOR OF The UNITED STATES BUREAU OF MINES, Appellee.**

No. 7425.

United States Court of Appeals
Fourth Circuit.

Argued June 10, 1957.

Decided July 13, 1957.

John K. Pickens, Washington, D. C. (Jerry N. Griffin, M. Joseph Stoutenburgh, and Dawson, Griffin, Pickens & Bird, Washington, D. C., on brief), for appellant.

Peter H. Schiff, Atty., Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., and Melvin Richter, Atty., Dept. of Justice, Washington, D. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOBELOFF and HAYNSWORTH, Circuit Judges.

SOBELOFF, Circuit Judge.

This appeal brings before us an order of the Federal Coal Mine Safety Board of Review which reviewed and sustained an order of a Federal Coal Mine Inspector classifying Rosedale Mine No. 8, at Maidsville, West Virginia, as a "gassy" mine. Under the provisions of Title II, The Federal Coal Mine Safety Act, 66 Stat. 692, 30 U.S.C.A. § 471 et seq., the effect of such an order is to require certain additional precautions, especially by way of ventilation, to prevent accumulation of explosive quantities of methane and the ignition of such gas and of coal dust in the mine.

The statute is the outgrowth of a long history of major disasters in coal mines. In the half century preceding its enactment in 1952, nearly ten thousand miners lost their lives and many others suffered injury. A chief menace is methane gas, sometimes called "firedamp" or "marsh gas." It is a product of the decomposition of organic matter, and is found in some degree in almost all coal mines. Although it is colorless, odorless, tasteless, non-poisonous, and, as far as is known, has no physiological effect upon man, it is, when sufficiently concentrated, highly flammable and explosive in the presence of ignited oxygen. A lighted match or

cigarette, or an electric spark may set off an explosion. Keeping down the accumulation of methane in a mine where it is known to exist is the indispensable safety measure, if operations are to continue.

The limits of danger are variable under different conditions of temperature, pressure, the presence of other gases, and other factors; but the characteristics of the gas need not be further explored in this opinion, for Congress has set a limit on the toleration of methane in coal mines. It has determined that if a duly authorized representative of the Bureau of Mines, making an inspection as he is empowered to do under Section 202 of the Act, 30 U.S.C.A. § 472, finds methane "by air analysis in an amount of 0.25% or more, in any open workings of a mine," he shall make an order requiring the operator of the mine to comply with the provisions of Section 209 of the law, 30 U.S.C.A. § 479, pertaining to gassy mines, which requires ventilation and other safety equipment. In testing the air of a mine for the presence of methane, it is required by Section 203(d) of the Act, 30 U.S.C.A. § 473(d), that the sample be taken "at a point not less than twelve inches from the roof, face, or rib" of the mine. The legislative history indicates that it was deemed that a sample taken closer than twelve inches from the roof, face, or rib would not be representative of the air in open workings of the mine.

Section 205, 30 U.S.C.A. § 475, creates the Federal Coal Mine Safety Board of Review, consisting of three members appointed by the President. One is required to be a person "who by reason of previous training and experience may reasonably be said to represent the viewpoint of coal-mine operators"; a second is required to be a person "who by reason of previous training and experience may reasonably be said to represent the viewpoint of coal-mine workers"; and the third, who is the chairman of the board, is required to be "a graduate engineer with experience in the coal-mining industry, or shall have had at least five years' experience as a practical mining engineer in the coal-mining industry." This board is authorized, by Section 205(g) and (h), 30 U.S.C.A. § 475 (g) and (h), to make rules and to hold hearings in cases where an inspector has made an order which the Director of the Bureau of Mines has refused to annul or revise upon the application of the mine operator.

The Act provides in Section 207(e), 30 U.S.C.A. § 477(e), that "the Board shall not be bound by any previous findings of fact by the Respondent [the Director of the Bureau], or by any other representative of the Bureau." Evidence may be offered by both parties to the proceeding, and the burden of proving the existence of the dangerous condition, namely, the presence of methane in an amount of 0.25% or more, is upon the Bureau.

■ From an adverse ruling of the Board of Review, a further appeal to the United States Court of Appeals for the circuit in which the mine is located may be taken by an aggrieved operator or by the Director of the Bureau of Mines; and the Court is required to hear the appeal on the record made before the Board. The Court of Appeals may affirm, annul, or revise the order of the Board, or may remand the proceedings for further action. Section 208(e), 30 U.S.C.A. § 478, specifies our scope of review: "The findings of the Board as to facts, if supported by substantial evidence on the record considered as a whole, shall be conclusive." This is the same range as that prescribed under the Administrative Procedure Act, 5 U.S.C.A. § 1009(e).

Rosedale Coal Company, the appellant mine owner, raises a number of contentions on this appeal, pertaining to the method used by the inspector in taking the sample of air from the mine; the handling of that sample in the laboratory to which the inspector sent it; the reliability of the laboratory tests; the admissibility of certain items of evidence, and the competency of the inspector; but the main issue, to which all others

are subsidiary, is whether the decision of the Board is supported by substantial evidence on the record considered as a whole.

On October 24, 1956, a duly authorized inspector of the Bureau of Mines took a sample of mine atmosphere from Rosedale Mine No. 8, in the presence of the mine operator's foreman. He followed the customary procedure of snipping the neck of a vacuum bottle, allowing the mine air to fill the bottle. It was then sealed in the usual manner with a cartridge containing beeswax. The laboratory analysis showing the presence of 0.31% methane in the sample, the inspector passed an order classifying the mine as "gassy." The owner's application to the Director of the Bureau of Mines to annul the inspector's order was denied, and the owner then sought review by the Federal Coal Mine Safety Board of Review. The Board upheld the Director's refusal to annul the inspector's order, and this appeal followed.

## I

The mine owner complains that the inspector who initially classified the mine as "gassy" failed to measure the distance between the sample bottle and the roof of the mine to ascertain that the distance was not less than twelve inches. While the Board's opinion does not condone the inspector's failure to use the ruler or metallic tape which he had with him at the time, the testimony shows clearly that according to his estimate the sample was taken at a minimum distance of thirteen or fourteen inches from the roof. The mine foreman, who was present when the sample was taken, testified that he was not certain of the distance, because it was not measured; but he admitted that he was fully aware of the Act's twelve-inch requirement and that when the inspector took the sample, he "thought it was all right." He acknowledged telling the inspector that he was "satisfied with the procedure."

Inasmuch as the inspector had to assume a kneeling position when taking the sample, because the distance from floor to roof at the spot in question was between forty-eight and fifty-six inches, he perhaps for this reason failed to use the ruler. He demonstrated to the Board of Review the procedure which he followed, and the foreman, who saw him take the sample and was present at the board hearing when the inspector testified, agreed that the demonstration was "reasonably close" in reflecting the position of the neck of the bottle when the neck was broken. It is undisputed that, according to the physical demonstration, the sample was taken more than fifteen inches from the roof.

The statute itself is silent as to how the twelve-inch distance is to be determined. Doubtless, strict observance of the Board's rule requiring actual measurement would be safer than mere estimation and would avoid controversy. We think, however, that in view of the foreman's substantially corroborative testimony, the Board was justified in finding that the sample was, in fact, taken "at a point not less than twelve inches from the roof," as required by law.

## II

It was strongly contended before the Board of Review and in this Court that the sample was not properly identified, transmitted to the laboratory, and accounted for, so as to rule out the possibility of contamination or confusion of the sample with other material in the laboratory.

On the day the inspector took the sample, October 24, 1956, he placed the bottle in a mailing container, to which had been taped an envelope enclosing the customary identifying cards showing the source of the sample, and deposited it in the mailing room of the Bureau's Morgantown station. It was addressed to the Bureau's gas laboratory at Pittsburgh, but apparently did not reach the laboratory until November 2. The laboratory report was received by the inspector on November 13. This lapse of time is pointed to by Rosedale as a circumstance casting doubt upon the identity of the sample analyzed and reported on. Rose-

dale also suggested many possibilities for confusion of the sample with other materials in the laboratory, but offered no evidence to support these suggestions.

The only testimony as to what happened in the laboratory came from laboratory employees and supports the presumption of regularity in the procedure. The laboratory's witnesses maintained that there was no possibility of a mix-up in the samples, and, to refute Rosedale's intimations of possible contamination, went into some detail in explaining their routine. It was shown that in the practice of the laboratory, no analyst ever handled samples from two different mines at the same time. It was shown how the samples are handled on the racks, and with what precautions they are opened for examination of the contents.

■ It would be utterly impracticable to require, as the appellant insists, that the laboratory shall account for the chain of possession of the sample so thoroughly as to rule out every conceivable possibility that the sample was tampered with. Neither tampering nor any motive to tamper is indicated in the evidence, and the only testimony is that of the laboratory personnel, who swore that the sample was handled, so far as anyone knows, in the customary fashion. See United States v. Chemical Foundation, 272 U.S. 1, 14, 15, 47 S.Ct. 1, 71 L. Ed. 131. Even in criminal cases, no such exacting rule is insisted on. United States v. S. B. Penick & Co., 2 Cir., 136 F.2d 413.

It would doubtless avoid controversy if the Bureau of Mines, in taking samples, supplied a part of the official sample to the owner for independent examination. Such is the procedure of the Food and Drug Administration, pursuant to the requirement of its governing statute. 21 U.S.C.A. § 372(b). A similar practice could be instituted by adopting an appropriate rule; this is not, however, the requirement here. However desirable it might be to have such a rule or procedure, its absence presents no legal infirmity, although it is a circumstance to be noted in considering the record.

Significantly, no attempt was made by the mine owner to take a sample independently to show that less than 0.25% methane was present in the mine when the official sample was taken.

A striking feature of the record which the Board doubtless took into consideration is that although on cross-examination of the Bureau's witnesses, numerous contingencies were explored in which there might have arisen some irregularity in handling the sample in its course through the laboratory, there was no evidence from any source to lift these notions above the level of conjecture.

In this state of the record, the Board was clearly justified in concluding that the sample reported on by the laboratory was the one taken in the presence of the mine foreman, and that it had not been contaminated.

## III

■ The appellant, we think, puts too narrow a construction on the provision of Section 203(d) of the Act, which requires the inspector to make the "gassy" finding an order. The appellant recognizes, in accordance with the decision of the Sixth Circuit, in Director, United States Bureau of Mines v. Princess Elkhorn Coal Co., 226 F.2d 570, 573, that it would be utterly unreasonable to require the inspector to analyze the gas samples personally. That Court declared: "To interpret the statute as requiring the inspector to make his own personal analysis would, in effect, vitiate the Act." It is insisted in this case, however, that the inspector was not sufficiently familiar with the principles involved in the scientific processes employed by the laboratory technicians to enable him to make a personal judgment. The statute itself demands no such qualification on the part of the inspector.

When a fact to be determined by an official involves the use of elaborate scientific machinery, he is not expected to act without the customary aids. It is a commonplace of our daily experience

that certain facts cannot be ascertained except with the cooperation of others skilled in conducting processes with special equipment. The practice of officials who refer materials for scientific testing, even to private laboratories, is not unknown. Sometimes the laboratory's determination may be completely decisive of the entire issue. Portsmouth Stove & Range Co. v. Mayor and City Council of Baltimore, 156 Md. 244, 144 A. 357, 360, and cases there cited. It is not essential to the validity of the official action that the person for whom the test is conducted shall himself be proficient in the techniques employed. In today's extreme specialization of scientific knowledge, to insist on such a requirement would in many cases paralyze action.

## IV

The appellant also contends that the sample was improperly analyzed. The analysis was according to the Haldane method of analyzing for combustible gas. This method has been known for nearly sixty years and has been practiced by the Bureau of Mines for twenty years. It is a well established fact that, in combustion, one volume of methane combines with two of oxygen to form one volume of carbon dioxide and two of water vapor. The vapor condenses and occupies negligible space, so that only carbon dioxide remains. The contraction has been two volumes. The amount of contraction, compared to the resultant volume, therefore, is expressed as a ratio of two to one.

In the analysis of the critical sample, the laboratory record showed a 2.24 to 1 ratio. Much of the testimony related to the significance of this deviation. Bureau witnesses insisted that it was not significant and sought to explain it as the result of a misreading of the apparatus which would not affect the substantial correctness of the finding for the methane concentration in the sample. The mine owner pointed out, correctly, that if methane is not the only gas present, the Haldane method, which is based on measurement due to contraction through combustion, may be misleading. It was suggested by counsel that the result may be misinterpreted as showing that the reduction in volume due to combustion is because of methane, whereas it is due to the other gas. Moreover, the presence of "a trace of carbon monoxide" in the tested sample was indicated. The Bureau witnesses were closely cross-examined as to the potential inaccuracy of the Haldane process, if carbon monoxide in substantial quantity was present with the methane gas. The witnesses insisted that the quantity here was not substantial enough to put the results in doubt. The point was debated at length, and the Board accepted the explanations of the Bureau's witnesses, rather than the unsupported inferences suggested by the cross-examiner.

It is notable that here, too, the mine owner did not produce any scientific testimony, but contented itself with insistent suggestions of possible errors in the testing process. Intimations made and repeated in cross-examination cannot overcome the definite testimony, not inherently incredible, of witnesses who stand uncontradicted. The Board accepted the Bureau's testimony that collateral tests conducted by the laboratory technicians ruled out the possibility that the deviation in the rate of combustion was due to gases other than methane.

## V

When the intimation was made in the laboratory report that there was a trace of carbon monoxide gas in the sample, a second analysis was made to ascertain if it might not affect the accuracy of the finding. This was not a chemical but a physical test, by absorption spectroscopy, or the so-called infra-red method. By this method, too, the laboratory determined that the percentage of methane in the sample was .31%, and that carbon monoxide was definitely ruled out as a factor. The Bureau of Mines, in the first instance, and later, the Mine Safety Board of Review, reasoned that the spectroscopic test afforded corroboration of the results found by the Haldane test.

It is objected that the use of the infra-red test on mine atmosphere is relatively new and there was no showing that it had been generally accepted in the mining industry as accurate. It is urged that such a foundation was necessary before the infra-red test results could properly be admitted in evidence.

We cannot say that the reception of this evidence and the conclusion of the Board were without foundation, or that the use of the infra-red test to check the Haldane method is either capricious or lacking in probative value. The validity of the Haldane method itself was not attacked. The Bureau's witnesses, who possess high scientific qualifications, testified without contradiction that the infra-red method was appropriate and accurate for determining methane in air samples. The mine owner called no experts to challenge the scientific basis of this method. In this respect, the record differs sharply from the cases to which Rosedale refers us, wherein "drunk-o-meter" tests were rejected by courts when witnesses were produced who swore that the test was neither accurate nor generally accepted. We have no such testimony here. See People v. Morse, 325 Mich. 270, 38 N.W.2d 322; see also State v. Lindemuth, 56 N.M. 257, 243 P. 2d 325; State v. Bohner, 210 Wis. 651, 246 N.W. 314, 86 A.L.R. 611.

Bare assertions, without proof, cannot overcome affirmative and clear scientific testimony offered under oath. The Board was not required to assume that if witnesses were called by the appellant, they would support the appellant's assertions.

### VI

■ Rosedale makes a point of the failure of the Bureau to offer the laboratory charts before presenting any evidence pertaining to the infra-red test. The appellant's insistence was that the charts should have been produced in advance as a necessary foundation for any such testimony. We disagree. The production of the charts is not a rigid condition precedent. The matter is one resting largely in the discretion of the hearers, although it is the customary practice for the party offering evidence concerning laboratory tests to have such charts in court. Of course, the opposing party should be afforded full access to the records for purposes of cross-examination. When cross-examination was reached, however, such opportunity was not sought by the appellant and was not denied it. Whatever safeguard would attach to the production of the charts in advance, the same protection could have been achieved on cross-examination.

■ The strictness of the rules of evidence which are observed in courts of law may be relaxed somewhat in an administrative proceeding if fundamental fairness is not departed from. As Chief Justice Stone said: "It has long been settled that the technical rules for the exclusion of evidence applicable in jury trials do not apply to proceedings before Federal administrative agencies in the absence of a statutory requirement that such rules are to be observed." Opp Cotton Mills v. Administrator, 312 U.S. 126, 155, 61 S.Ct. 524, 537, 85 L.Ed. 624.

### VII

As to allegedly conflicting scientific opinions expressed by a Bureau witness in another case, this was unquestionably a proper subject for cross-examination and for debate. It was thoroughly exploited at the Board hearing, but we cannot say that the asserted conflict in the witnesses' opinions so detracted from or weakened his testimony in this case as to require it to be ruled out. Certainly it was not the sole or indispensable basis of the Board's conclusions.

### VIII

■ Finally we come to the issue which is central to the entire case, the broad question as to whether the decision and the order of the Board are supported by substantial evidence on the basis of the record considered as a whole. The breadth of review permitted a Court of Appeals in appeals from an administrative agency is not as great as in equity appeals or appeals from district judg-

es sitting without a jury, but we are nevertheless called upon to give the record more than a superficial examination. While we are not authorized to substitute our own judgment of the facts if there is genuine room for divergent views, our role is not automatically and uncritically to affirm a decision when we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456.

The Board is not free to proceed upon mere suspicion and surmise, and its action will not be saved from the condemnation of arbitrariness merely by some stray shred of testimony considered out of context and lacking credibility. There must indeed be a real, and not merely casuistic, basis in the record taken as a whole. In our inquiry as to whether the basis upon which the Board acted is substantial, a certain latitude must be allowed the Board in choosing the methods of investigation and in judging the significance of the facts thus developed. Especially is this true when we are dealing not with everyday facts which may be readily appraised by anyone without special preparation, but with data that requires a background of special knowledge for its perception and proper interpretation. Yet we cannot escape the duty to ascertain, in the light of the record as an entirety, if the Board's decision is justified upon "a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. N. L. R. B., supra, 340 U.S. at page 490, 71 S.Ct. at page 466.

We have applied this standard of judicial review and scrutinized the record as a whole, without ignoring the possible infirmities in the witnesses' testimony brought out in cross-examination, and the inferences that may reasonably be drawn therefrom. We are convinced that in resolving the alleged conflicts, the Board acted not unfairly or without rational basis, and that its ultimate decision is substantially grounded. Its order is therefore

Affirmed.