**ST. MARYS SEWER PIPE COMPANY** (North Point Mine), Appellant,

v.

**DIRECTOR OF THE UNITED STATES BUREAU OF MINES.**

No. 12591.

United States Court of Appeals Third Circuit.

Argued Oct. 9, 1958.

Decided Jan. 16, 1959.

Ernest R. vonStarck, Philadelphia, Pa. (T. G. Gregory, B. R. Coppolo, St. Marys,

Pa., Ed D. Schorr, Columbus, Ohio, Arthur Littleton, J. Wesley Oler, Robert H. Young and Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellant.

Lionel Kestenbaum, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This appeal brings before us an order of the Federal Coal Mine Safety Board of Review (Board) which reviewed and sustained [1] an order of a Federal coal mine inspector classifying the North Point Mine of Dora, Pennsylvania, owned and operated by appellant, as a "gassy mine." The effect of such an order pursuant to the provisions of Title II, the Federal Coal Mine Safety Act, 66 Stat. 692, 30 U.S.C.A. § 471 et seq., is to require certain special precautions, especially by way of ventilation and safety equipment, in addition to those practices applicable to all coal mines. The Act also provides for review, by the Court of Appeals for the circuit in which the mine affected is located, of orders promulgated by the Board. 30 U.S.C.A. § 478. The Court of Appeals may affirm, annul, or revise the order of the Board, or may remand the proceedings for further action. The scope of review is the same as that provided for under the Administrative Procedure Act, 5 U.S.C.A. § 1009(e); namely, "The findings of the Board as to facts, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.S.C.A. § 478(e). Rosedale Coal Co. v. Director of U. S. Bureau of Mines, 4 Cir., 1957, 247 F. 2d 299.

The pertinent facts as found by the Board, which are largely undisputed, are as follows: The mine is operated in the

1. The Board sustained the order of the Federal coal mine inspector in a 2 to 1 vote by order dated March 13, 1958.

lower Kittanning coal seam; at least two known gas wells penetrate the coal seam in this mine; prior to January 17, 1957, gas had never been detected in this mine in an amount in excess of .03 per cent methane; none of the other mines in the area is presently classed as gassy; on January 17, 1957, there was a gas ignition in "1" left drainage entry and still another on February 5, 1957; shortly thereafter, the Federal coal mine inspector assigned to this mine became aware of the ignitions and instituted an investigation; the investigation on February 18, 1957, indicated by use of a permissible flame safety lamp that an explosive gas-air mixture existed in 1 left drainage entry; and an air sample obtained the same day, by appropriate means, contained 15.8 per cent methane. The Federal inspectors, finding an imminent danger of a mine explosion, issued a mine closing order dated February 18, 1957, pursuant to Section 203 (a) (1) of the Act, which order was later annulled on September 17, 1957.[2] The appropriateness of this order has not been contested. However, the gas ignition of February 5, 1957, and the findings of methane by permissible flame safety lamp and by analysis of the air samples taken on February 18, 1957, are the bases for the classification order of December 9, 1957, which is here in issue.[3] On the latter date the Federal coal mine inspector issued and posted a notice and order under Section 203(d) of the Act, requiring the operator to comply with the provisions of Section 209 which pertain to gassy mines.

Appellant timely filed an application for annulment of the order, alleging, in substance, that the methane in question resulted from gas which escaped from a gas well located on the mine property; that necessary corrective measures were taken in conformity with state regulations; and that, by reason of this corrective action, there is no longer any gas in the mine and no danger of a mine explosion. After due notice to the parties, the Board held a hearing at which both parties were represented by counsel and given full opportunity to participate and introduce relevant evidence. Among other facts the Board found that the methane upon which the classification order is based had in fact seeped into the mine from an abandoned gas well which has since been reconditioned. Upon the record, the Board concluded that the St. Marys Sewer Pipe Company was engaged in commerce within the meaning of the Act and that methane was properly found to have been ignited in the North Point Mine and to have been in excess of the statutorily decreed percentage of 0.25 per cent. The Board thereupon ordered that the application for annulment of the order of December 9, 1957, be denied.

The jurisdictional question need not detain us, for appellant concedes that its operations are subject to the Act. The issue presented by this appeal is, therefore, a narrow one with, however, grave implications for all parties connected with the mining industry. Under circumstances which have been outlined above, methane was twice ignited and variously found by appropriate tests in critical amounts in appellant's mine. The question is whether this mine should nevertheless be exempted from the man-

2. Section 203(a) (1) of the Act provides for the closing of the mine when imminent danger of a mine explosion, mine fire, mine inundation or man-trip or man-hoist accident is found by a duly authorized representative of the Bureau, pending correction of the immediate danger.

3. The gassy classification order was issued pursuant to § 203(d), which reads as follows: "If a duly authorized representative of the Bureau, upon making an inspection of a mine, as authorized in section 202, finds that methane has been ignited in such mine or finds methane by use of a permissible flame safety lamp or by air analysis in an amount of 0.25 per centum or more in any open workings of such mine when tested at a point not less than twelve inchs from the roof, face, or rib, he shall make an order requiring the operator of such mine to comply with the provisions of section 209 of this title which pertain to gassy mines, in the operation of such mine." 30 U.S.C.A. § 473(d).

date of Section 203(d) because the methane so found had its source, not in the immediate coal seam, but in natural gas which had seeped into the mine from an abandoned well penetrating the seam.

Appellant concedes that Section 203 (d) of the Act directs that a gassy mine classification order shall be entered when methane is ignited or found to exist in a coal mine in excess of the permissible statutory limit. It contends, however, that the term methane, as employed in the Act, was used by Congress as a word of mining art to refer to methane inherent in the coal and released therefrom as the result of mining operations.

 The statute we are called upon to interpret is the out-growth of a long history of major disasters in coal mines. The death toll from mine disasters [4] became so appalling and voluntary compliance with the safety standards set by the Bureau of Mines so haphazard that in 1952 Congress determined to make compliance with the safety standards mandatory. It is so obvious as to be beyond dispute that in construing safety or remedial legislation narrow or limited construction is to be eschewed. Rather, in this field liberal construction in light of the prime purpose of the legislation is to be employed. Lilly v. Grand Trunk Western R. Co., 1943, 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411; Swinson v. Chicago, St. Paul, M. & O. Ry., 1935, 294 U.S. 529, 55 S.Ct. 517, 79 L.Ed. 1041; Binkley Mining Co. v. Wheeler, 8 Cir., 133 F.2d 863, certiorari denied 1943, 319 U.S. 764, 63 S.Ct. 1326, 87 L.Ed. 1715; Sablowsky v. United States, 3 Cir., 1938, 101 F.2d 183. This statute is remedial, with a humane purpose in view and is therefore entitled to a liberal construction. But, in the circumstances of this case, there is yet another principle that must be taken into account. We are dealing with a situation where there has been a con-

struction of a remedial statute by the administrator charged with its execution and by the Board established by Congress to review his actions. Congress provided in detail for a Board of Review to be composed of experts in the field of coal-mining. These administrative interpretations should be recognized as having peculiar persuasiveness and weight. Ordinarily, such constructions should be accepted by the courts unless they could not be reasonably or soundly made under the terms of the statute. National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed 1170; Rosedale Coal Co. v. Director of U. S. Bureau of Mines, 4 Cir., 1957, 247 F.2d 299; Director, U. S. Bureau of Mines v. Princess Elkhorn Coal Co., 6 Cir., 1955, 226 F.2d 570; American Airlines, Inc. v. Civil Aeronautics Board, 7 Cir., 1949, 178 F.2d 903; Miller Hatcheries, Inc. v. Boyer, 8 Cir., 1942, 131 F.2d 283. However, the very fact that Congress has seen fit to provide for judicial review makes it evident that administrative interpretations must have a basis in law and must be within the granted authority. Social Security Board v. Nierotko, 1946, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718.

Although Congress saw fit to utilize the term methane without restriction, appellant contends that by the use of the word Congress actually intended to refer only to methane generated from coal. To support its contention appellant refers both to the statute and the legislative history. In regard to the statutory context, appellant refers to Section 209 and contends that the ventilation requirements are not adequate in the event of a serious break in a gas well passing through the mine, and notes that Section 209(d) (4), also relating to ventilation, imposes added ventilation requirements "where methane is liberated in large quantities" in virgin territory. Certainly the former was a ques-

4. A history of mine disasters and Federal mine legislation is contained in S.Rep. 1223, 82nd Cong., 2d Sess. (1952), 2

U.S.Code Congressional & Administrative News 1952, p. 2221.

tion of judgment for Congress and the latter section is ambiguous at best. It fails to indicate anything other than that Congress was aware that methane is inherent in coal and is released therefrom by the mining operation. Further, its recognition of this fact and disregard of it when setting forth the mandate in Section 203(d) may actually evidence an intention contrary to that contended for by appellant. It is also pointed out that Section 203(d) requires that air samples used to determine the presence of a prohibitory amount of methane in a mine must be taken at a point "not less than twelve inches from the roof, face, or rib" of the open workings. Although appellant asserts that this requirement clearly contemplates a test for methane generated by the coal, we do not view it as such. For, inasmuch as Congress was aware that methane is released when coal is fractured, the twelve-inch testing requirement equally supports the view that in order to obtain a sample representative of the mine atmosphere, Congress directed that the sample be taken a specific distance from the roof, face, or rib of open workings. The methane content of a sample would normally be unrepresentative if taken at a closer distance even if the methane was not primarily coal-generated but rather emanated from abandoned gas wells. Nothing in the statute itself indicates to us that Congress intended a more limited meaning to the term methane.

In interpreting statutes, it is the function of the courts to construe the language so as to give effect to the intent of Congress. A number of cases [5] have been cited to us which indicate that our efforts to discern this intent need not be confined to the words of the statute even when they appear as clear as those in the instant case. Recognizing this to be the law, it is well to keep in mind the statement of the Supreme Court in Gemsco, Inc. v. Walling, 1945, 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed. 921, where a similar contention was raised:

> " * * * The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction."

Study of the legislative history does indicate an awareness on the part of Congress that methane is generated when coal is fractured.[6] However, it also indicates that the attention of Congress was directed to the dangers inherent in the presence of methane from gas wells.[7] No clear support for appellant's contention is discerned. Contrariwise, the intent of Congress appears clear beyond peradventure of a doubt. It was enacting safety legislation to prevent holocausts resulting from ignition of methane gas. The source of the methane did not appear to concern Congress except as it related to proposed testing procedures. Safety was the keynote of the legislation, and the presence of methane in percentages in excess of the statutory minimum was to trigger the application of Section 209 relative to "gassy mines." Aware that the explosive nature of methane in the presence of coal dust was dangerous in the extreme, regardless of its source, Congress evidenced no discernible intention to limit the scope of this safety legislation.

Appellant contends further that Congress was intent on prescribing con-

5. Harrison v. Northern Trust Co., 1943, 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407; United States v. Dickerson, 1940, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356; United States v. American Trucking Associations, Inc., 1940, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

6. S.Rep. 1223, 82nd Cong., 2d Sess.,

(1952), 2 U.S.Code Congressional & Administrative News 1952, p. 2221.

7. Hearings before Subcommittee on Mine Safety of the Senate Committee on Labor and Public Welfare on S.Bill 1310, 82nd Cong., 2d Sess. 168, 172–173 (1952).

ditions for mines where the methane, whose presence had been detected, was from a natural source and not an artificial one. It characterizes the instant facts as showing an artificial piping or injection of the gas into the mine. Suffice it to say that in this case the gas naturally seeped into the mine shaft from a natural source through an alleged solid block of coal surrounding the abandoned well. The facts as found by the Board fail to indicate any artificial introduction of methane. On the contrary, they evidence a natural situation pregnant with calamitous possibilities. To remedy just such situations Congress enacted the Federal Coal Mine Safety Act.

Lastly, the Board's interpretation of the statute is attacked as producing an unjust, oppressive, and absurd result. This assertion is based upon the fact that other mines in the area here involved are not classified as gassy and that this classification will force appellant to undergo the substantial additional burden and expense of forever thereafter operating in accordance with the gassy mine requirements. This argument is bottomed upon appellant's contention that its rehabilitated well is safer than similar wells in other mines in the area that have not been reconditioned. So far as any constitutional question may be raised by this argument, it is sufficient to point out that the Act uniformly applies to the conditions which call its provisions into play —namely presence of methane in excess of a prescribed amount. As was stated in Clark Distilling Co. v. Western Maryland Railway Co., 1917, 242 U.S. 311, 327, 37 S.Ct. 180, 185, 61 L.Ed. 326, " * * the question really is a complaint as to the want of uniform existence of things to which the act applies, and not to an absence of uniformity in the act itself." Cf. Gauley Mountain Coal Co. v. Director of U. S. Bureau of Mines, 4 Cir., 1955, 224 F.2d 887.

We therefore conclude that the Board's interpretation of the statute carries out the intent of Congress and is a reasonable interpretation of Section 203(d), and we will not disturb it.

The order of the Board will be affirmed.