**P. LORILLARD COMPANY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**GENERAL FOODS CORPORATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**Nos. 12665, 12709.**

United States Court of Appeals Third Circuit.

Argued Feb. 6, 1959.

Decided June 4, 1959.

Rehearing Denied Aug. 4, 1959.

---

Cyrus Austin, New York City (Appell, Austin & Gay, New York City, Frederick F. Mack, White Plains, N. Y., Robert McCormack, Perkins, Daniels, McCormack & Collins, New York City, on the brief), for petitioners.

Frederick H. Mayer, Atty., F.T.C., Washington, D. C. (Earl W. Kintner, Gen. Counsel, James E. Corkey, Asst. Gen. Counsel, F.T.C., Washington, D. C., on the brief), for respondent.

Malcolm A. Hoffmann, New York City (Rosenman, Goldmark, Colin & Kaye, Ralph F. Colin, Geraldine B. Zorbaugh, Robert J. Dunne, Norman Solovay, New York City, on the brief), for Columbia Broadcasting System, Inc., amicus curiae.

Before KALODNER and STALEY, Circuit Judges, and STEEL, District Judge.

STALEY, Circuit Judge.

We are asked by these petitions pursuant to Section 11 of the Clayton Act, 38 Stat. 734, 15 U.S.C.A. § 21, to review and set aside two substantially identical cease and desist orders issued by the Federal Trade Commission. The orders to be reviewed were issued by the Commission against General Foods Corporation and P. Lorillard Company,[1] the petitioners, at the conclusion of proceedings upon complaints which charged them with violations of Section 2(d) of the Clayton Act, as amended.[2] These proceedings were had before the hearing examiner upon stipulated records with annexed exhibits. The initial decisions of the hearing examiner, which include cease and desist orders, were adopted by the Commission without further opinion.[3]

The complaints charged the petitioners with having made payments to certain broadcasting companies[4] for the benefit of chain-store customers of petitioners, thus providing broadcasting time "to the favored customers for said customers' own advertising purposes." The payments thus effected were alleged to have been made as compensation or in consideration for services or facilities furnished by these favored customers in connection with the offering for sale and the sale of petitioners' products. Further, it is averred that the benefits so conferred on some of petitioners' customers were not made available on proportionately equal terms to petitioners' other customers, in violation of Section 2(d) of the Clayton Act, as amended.

The stipulated facts may be summarized as follows: In 1950 and 1951 the sale of broadcasting time had become difficult,

1. Additional and similar complaints had been filed against the following companies: Groveton Papers Company, FTC Docket 6592 (order issued May 7, 1958); Pepsi-Cola Company, FTC Docket 6593 (dismissed on other grounds); Coca-Cola Bottling Company of New York, FTC Docket 6594 (dismissed on other grounds); Sunkist Growers, Inc., FTC Docket 6595 (consent order issued); Sunshine Biscuits, Inc., FTC Docket 6597 (order issued May 7, 1958); Piel Bros., Inc., FTC Docket 6598 (order issued May 7, 1958); Hudson Pulp & Paper Corp., FTC Docket 6599 (order issued May 7, 1958).

2. "(d) That it shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in considera-tion for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionately equal terms to all other customers competing in the distribution of such products or commodities." 49 Stat. 1526, 15 U.S.C.A. § 13.

3. These cases involve common questions of law and fact. Inasmuch as they were briefed and argued together, we see no necessity for separate opinions.

4. The "broadcasting companies" referred to were the American Broadcasting Company (ABC), National Broadcasting Company, Inc. (NBC), and Columbia Broadcasting System, Inc. (CBS), the latter having submitted a brief in this court as amicus curiae.

and the broadcasting companies each developed promotional schemes to enable them to sell time to manufacturers and sellers of grocery products. Although the companies devised their plans independently they are substantially similar in content, providing for in-store promotions as an inducement to purchase radio and television time. The broadcasting companies negotiated contracts with certain grocery chains whereby they covenanted to provide the chains with specified amounts of radio or television time each week during the term of the contracts. The contracts provided that the broadcasting time would be used by the chains only for their own advertising. In exchange therefor the chain stores agreed to conduct a specified number of weeklong promotional displays in their stores of products sold therein. The products and dates were not specified in the contracts but rather it was provided that they were to be agreed upon by the parties, the broadcasting companies proffering suggestions, subject to the right of the chains to decline to promote products not deemed by them to be suitable for promotion in their stores. These contracts were made without any prior commitment or agreement involving anyone other than the grocery chains and the broadcasting companies. Following negotiation of this series of contracts, the broadcasting companies solicited petitioners and other manufacturers and sellers of grocery products to purchase radio or television time from them, and, as an added inducement for such purchase, offered in-store promotions of petitioners' products in the chain stores under contract. These promotional plans were variously named "Supermarketing," "Chain Lightning," "Mass Merchandising," and "Sell-A-Vision" and were promoted by means of brochures and circulars stating the details of the offers. The leaflets indicated that purchasers of a minimum amount of radio or television time would be provided, at no extra cost, with a specific number of in-store promotions of their products. The broadcasting companies stated in their brochures that they were able to offer the displays as a result of the firm contractual commitments which they had previously negotiated with specified chain stores. The circulars also emphasized the size of the chains under contract, their annual volume, and the percentage of the retail market that they controlled.

Petitioners entered into contracts for the purchase of broadcasting time, and, although the contracts contained no mention of the in-store promotions and specifically negatived any agreement other than that contained in the written contract,[5] they received the benefits of the plans as specifically set forth in the brochures. In fact, in many instances, after notification of the proposed date of a promotion, petitioners contacted the designated chain store for the purpose of arranging the details of the in-store promotional displays. Without exception, those of petitioners' customers who received radio or television advertising time, pursuant to the contracts described herein, were grocery chains in competition in the resale of petitioners' products with other grocery chains and independent customers of petitioners in the same market areas. The latter customers did not receive nor were they offered broadcasting time or anything of value in lieu thereof.

Petitioners deny that they paid anything to or contracted with the broadcasting companies "for the benefit of" a customer within the meaning of Section 2(d) of the Clayton Act. Further, they deny having paid for or supported the furnishing of broadcasting time to the

---

5. The following clause appears in both the ABC and CBS contracts:

"This contract contains the entire agreement between the parties and is not subject to oral modification."

The NBC clause reads as follows:

"This contract constitutes the entire agreement between the parties relating to the subject matter hereof and may not be changed, modified, renewed or extended except by an agreement in writing signed by the party against whom enforcement of the change, modification, renewal or extension is sought."

chains and, lastly, deny having adopted or having become a party to the broadcasting companies' sales promotions. It is readily apparent that the arguments overlap and that their determination depends largely upon the Commission's interpretation of Section 2(d) and the stipulated facts.

■ It is appropriate to keep in mind that administrative interpretations of statutes by agencies charged by Congress with their execution are recognized as having peculiar persuasiveness and weight. National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; American Airlines, Inc. v. Civil Aeronautics Board, 7 Cir., 1949, 178 F.2d 903; Miller Hatcheries, Inc. v. Boyer, 8 Cir., 1942, 131 F.2d 283. As we recently stated in St. Marys Sewer Pipe Co. v. Director of United States Bureau of Mines, 3 Cir., 1959, 262 F.2d 378, 381, "Ordinarily, such constructions should be accepted by the courts unless they could not be reasonably or soundly made under the terms of the statute." The agency's interpretation, however, must be consistent with the purposes of the statute for, as Justice Frankfurter states in the recent case of United States v. Shirey, 1959, 359 U.S. 255, 79 S.Ct. 746, 749, 3 L.Ed.2d 789,

> "Statutes, including penal enactments, are not inert exercises in literary composition. They are instruments of government, and in construing them 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.' United States v. Whitridge, 197 U.S. 135, 143, 25 S.Ct. 406, 49 L.Ed. 696. This is so because the purpose of an enactment is embedded in its words even though it is not always pedantically expressed in words. See United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 168, 74 L.Ed. 508. Statutory meaning, it is to be remembered, is more to be felt than demonstrated, see United States v. Johnson, 221 U.S. 488, 496, 31 S.Ct.

627, 55 L.Ed. 823, or, as Judge Learned Hand has somewhere put it, the art of interpretation is 'the proliferation of purpose.' "

■ The purpose of the section here involved was to eliminate all discriminations under the guise of payments for advertising or promotional services, and Congress employed language that would cover any evasive methods. This is made clear by the statement of Congressman Utterback, chairman of the House conferees, in explaining Section 2(d) and (e), as follows:

> "The existing evil at which this part of the bill is aimed is, of course, the grant of discriminations under the guise of payments for advertising and promotional services which, whether or not the services are actually rendered as agreed, results in an advantage to the customer so favored as compared with others who have to bear the cost of such services themselves. The prohibitions of the bill, however, are made intentionally broader than this one sphere, in order to prevent evasion in resort to others by which the same purpose might be accomplished, and it prohibits payment for such services or facilities, whether furnished 'in connection with the processing, handling, sale, or offering for sale' of the products concerned." 80 Cong.Rec. 9418.

Petitioners' argument when analyzed and stripped to its essentials is basically a plea for reliance upon technical rules of contract law. It asserts, in effect, that since it was not a party to the contract between the broadcasting companies and the chain stores and that since they preceded its contracts with the broadcasting companies, there is nothing illegal or violative of Section 2(d) in the transactions. On the other hand the Commission refuses to wear blinders and insists that the series of contracts be viewed as a whole. Substance is lent to the Commission's analysis by the presence in this case of a number of brochures or circulars which were utilized by the broadcast-

ing companies. Although it is true that the petitioners' contracts with the broadcasting companies contained no mention of the in-store promotions, they were prominently mentioned in the brochures. These promotions were not only held out as inducements for the purchase of broadcasting time by the petitioners, but were sought and utilized by them.

■ The petitioners' position is bottomed on the assumption that in deciding whether a violation of the statute has occurred the Commission must restrict itself to an assessment of the consequences which flow from a written contract by the application of formal principles which a court would be required to apply in an action between the contracting parties. If, however, we keep in focus the real question involved, that is, whether the petitioners have made payments to someone which actually are of benefit to their customers and not whether they have bound themselves to do so by a legally enforceable contract, it is readily apparent that petitioners' position is untenable. Certainly, the legal effect of the contracts involved may be relevant to the resolution of the real issue before the Commission, but it does not follow that the Commission must give to those contracts the effect for which the parties to them contend nor that it cannot view them in the setting of all the other evidence relevant to the issue before the Commission.

■ Petitioners contend here as they did before the Commission that they did not pay or contract to pay to any third person anything of value for the benefit of a customer. In support of this position, petitioners assert that a payment to or contract with a third person is not made for the benefit of a customer within the meaning of Section 2(d) unless the seller makes it with the intention of benefiting the customer or has reason to know that some direct benefit to the customer will proximately result therefrom. No authority for the former proposition is cited, and in fact it conflicts with the statement of counsel for the petitioners, Cyrus Austin, in his monograph entitled "Price Discrimination

and Related Problems Under the Robinson-Patman Act," revised edition, 1953, wherein it is stated at page 116:

"It is no defense for a seller charged with a violation of either of these sections [§§ 2(d) and 2(e)] to show that he furnished or paid for a service solely in his own interest and not pursuant to any prior understanding with the purchaser. These sections prohibit discrimination in merchandising allowances or services irrespective of whether the making of the payment or furnishing of the service was a term or condition of sale, or amounted to an indirect price discrimination."

In accord, State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 7 Cir., 1958, 258 F.2d 831, 837, certiorari denied sub nom. General Foods Corp. v. State Wholesale Grocers, 1959, 358 U.S. 947, 79 S.Ct. 353, 3 L.Ed.2d 352. This section of the Act does not concern itself with motive or intention. It is only concerned with the consequences which flow from an act. If those consequences eventuate, the act from which they result is forbidden. The Commission, however, went further than required and found that "the responsible officials of Respondent [petitioners] knew, or should have known, when they entered into the plan presented to Respondent by the broadcasting company, that Respondent, in adopting such plan, would be supplying the consideration which would constitute compensation for the benefits to be received by a few favored customers, to the prejudice of their competitors." This finding is amply supported by the record.

■ A substantial portion of petitioners' argument is directed to refuting the Commission's finding that they were the "sole financial support" of the promotional plan. Reliance is placed upon one case—State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 154 F.Supp. 471, D.C.N.D.Ill.1957, affirmed in part and reversed in part, 7 Cir., 1958, 258 F. 2d 831, certiorari denied sub nom. General Foods Corp. v. State Wholesale Grocers, 1959, 358 U.S. 947, 79 S.Ct. 353, 3

L.Ed.2d 352. In that case A&P and three grocery product manufacturers were charged with violation of Sections 2(d) and 2(e) by purchasing substantial advertising in Woman's Day magazine, a wholly-owned subsidiary of A&P. The court of appeals affirmed the dismissal of the 2(e) charge but found that the payments for advertising of defendants' products in Woman's Day violated Section 2(d). The rationale underlying the dismissal in that case is founded on the conclusion that the payments for advertising could not be held to represent a furnishing of a service to A&P. In addition to the obvious factual differences between the two cases, it is worthy of note that the court failed to cite or distinguish the line of cases beginning with Herbert v. Shanley Co., 1917, 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511, where Justice Holmes held that a single payment may indeed cover the cost of more than one object. Also see Pittsburgh Athletic Co. v. KQV Broadcasting Co., D.C.W.D.Pa. 1938, 24 F.Supp. 490; M. Witmark & Sons v. L. Bamberger & Co., D.C.N.J. 1923, 291 F. 776. The broadcasting companies are not eleemosynary institutions and the Commission could well find from the record that the grant of "free" broadcasting time [6] to the chain stores was part of the total transaction for which the petitioners paid. The fact that the charge for the whole transaction was attributed to a particular item, to wit, petitioners' advertising time, is not determinative. The Commission's conclusion that the payments made by the petitioners to the broadcasting companies inured to the benefit not only of petitioners, but also of the favored chains as compensation or in consideration for the in-store promotions afforded petitioners' products has warrant in the record and a reasonable basis in the law, and this court must accept it. National Labor Relations Board v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170.

█ Petitioners' last objection relates to the "sweeping" nature of the cease and desist orders issued by the Commission. Clearly, the orders in the instant cases go no further than that issued against the Ruberoid Company and specifically approved by the Supreme Court in Federal Trade Commission v. Ruberoid Co., 1952, 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081. Also see Moog Industries, Inc. v. Federal Trade Commission, 1958, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370, affirming Moog Industries, Inc. v. Federal Trade Commission, 8 Cir., 1956, 238 F.2d 43. The fact that these cases involved orders issued in the language of Section 2(a) of the amended Clayton Act should give us little pause, for Section 2(d) is much narrower in scope and therefore orders framed in its language would be well within the permissible ambit of the Commission's discretion.

The orders of the Commission will be affirmed.

STEEL, District Judge (dissenting).

Had petitioner [1] paid for the broadcasting time of the chains, either directly by payments to the chains, or indirectly by payments to the broadcasting companies independently of the purchase by petitioner of its own broadcast time, the payments clearly would have been for the "benefit" of the chains within the meaning of § 2(d). The petitioner did not do either of these things. But the Commission and a majority of the court hold that an identical significance must be attributed to the payments which petitioner made to the broadcasting companies in purchasing air time for itself.

A violation of § 2(d) of the Clayton Act entails, among other things, the following elements: (1) a discriminatory payment by a vendor for the benefit of a

---

**6.** We agree with petitioners' counsel that "nothing here turns upon the fact that the consideration which the broadcasting companies gave to the chains in return for in-store promotions was in broadcast time rather than in money."

**1.** General Foods will be treated as if it were the sole petitioner, for unless otherwise indicated the petitioner Lorillard stands in no different position.

customer, (2) in consideration for services or facilities furnished by the customer to the vendor in connection with the sale of a commodity of the vendor. Without both elements of benefit there can be no § 2(d) violation. The finding of the Commission that the in-store promotions offered by the broadcasting companies induced petitioner to enter into its contracts with the broadcasting companies implies that petitioner anticipated the receipt of a benefit by way of in-store promotions. This finding relates solely to the second element of a § 2(d) offense. The present point of inquiry is directed to the existence of the first element of a § 2(d) violation, viz., whether petitioner made a payment for the benefit of the chains.

In determining whether the petitioner's payments to the broadcasting companies were for the "benefit" of the chains within the meaning of § 2(d), it is easy to become bogged down in a semantic morass. The word "benefit" has various meanings depending upon the context of its use. In a sense, every dollar which the broadcasting companies took into their coffers during the time when air time was being granted to the chains was for the benefit of the chains regardless of the source of the income. Revenue was the life blood of the broadcasting companies upon which their very existence depended and without which the chains would have had no air media over which to advertise. The Clayton Act, of course, is not concerned with this type of benefit. It is aimed at discriminatory advantages which a vendor by virtue of his own conduct confers upon a vendee, or, under certain sections of the Act, reciprocal advantages which a vendor and vendee confer upon each other by virtue of their own respective acts. Whether petitioner's payments to the broadcasting companies were for the benefit of the chains must be gauged from this standpoint.

The contracts between the broadcasting companies and the chains under which the chains received air time antedated the contracts between the broadcasting companies and petitioner. The execution of the agreements by petitioner was not a contingency upon which the right of the chains to air time depended. That right had theretofore accrued; it was fixed, immediate and unqualified. Nothing was required of petitioner or anyone else to bring into fruition the right of the chains to air time save the performance by the broadcasting companies of their contracts with the chains. Petitioner was in no way responsible for this. So that on the face of the matter, the advertising which the chains become entitled to receive the moment they put pen to paper with the broadcasting companies was not the result of any payment by petitioner.

The Commission and a majority of the Court assert, however, that the separate elements of the sales promotional plan initiated by the broadcasting companies, i. e., the two sets of contracts, the brochures of solicitation, and the designation of products for in-store promotions, cannot properly be given fragmentary evaluation, but that each must be treated as an integral part of the whole. This approach would be understandable if the broadcasting companies were defendants and their activities were charged to be violative of the law. The broadcasting companies stand at the hub of the transaction. It was their correlating activities which gave to the plan whatever cohesiveness and interdependence was inherent in it. It was their efforts which were responsible for obtaining the in-store sales promotional rights from the chains. It was they who chose the chains from which petitioner might make its selection for in-store promotions. All this was done by the broadcasting companies without any prior commitment, authorization, agreement, or understanding with petitioner. This is a stipulated fact. So that no basis exists for the Commission's finding that the broadcasting companies occupied an "agency" relationship to petitioner through which petitioner in effect channeled payments to the chains in the modified form of broadcasting time.

The conclusion of the Commission that the actions of petitioner were of discriminatory benefit to the chains within § 2(d) intentment is not aided by theorizing that the broadcasting companies would not have renewed their contracts with the chains unless the sales promotion plan had been sufficiently supported by the totality of suppliers, including petitioner, who purchased broadcast time.[2] This approach makes petitioner's violation of the Act depend not only upon the contemporaneous actions of other suppliers but also upon the subsequent actions of the broadcasting companies in renewing their contracts with the chains when, so far as the record reveals, neither the suppliers nor the broadcasting companies were subject to control by petitioner. Whatever benefit the chains may have derived from this combination of events, is from petitioner's standpoint, too vicarious and causally remote to enmesh petitioner in the Act.

In the light of the peripheral relationship which petitioner bore to the plan, the statement of the Commission that petitioner became a "party" to and "adopted" the plan is meaningless. All petitioner did was to accept what the broadcasting companies offered. Yet, under the Commission's concept of "benefit", petitioner would be culpable under the Clayton Act even if it had not designated any of its products for promotion by the chains. For under the Commission's view, it was petitioner's payments to the broadcasting companies which constituted payment for the air time allotted to the chains. The amount of petitioner's payments did not depend upon whether it designated products for in-store promotions. Petitioner's payments were the same in either case. The failure of petitioner to designate products for in-store displays would have exculpated petitioner from liability under § 2(d), for the furnishing of services or facilities by a customer is a *sine qua non* to a § 2(d) violation.[3] However, without the designation of products for in-store promotion, petitioner's payments to the broadcasting companies, under the Commission's reasoning, would clearly have rendered petitioner liable under § 2(d)[4] for furnishing advertising discriminately to the chains, and under § 2(a)[5] for indirect

---

2. The Commission "assumed" that without the support of *either* petitioner the plan of the broadcasting companies would have been unprofitable and of short duration. This assumption is based upon the Commission's finding that *each* petitioner provided the "sole" financial support of the plan. This finding is unsupported by any evidence and is untenable on it face. Actually, the plan was availed of by eight other companies in addition to petitioner. (Fn. 1, Opinion of the Court). ABC sold an aggregate of advertising under its plan of $2,173,514.19, of which General Foods bought $157,211.01; CBS sold $1,057,470.03, of which General Foods bought $182,497.12; and NBC sold $1,247.468, of which General Foods bought $81,520.

3. If the mere right to designate products for in-store promotions (as distinct from the actual designation) is deemed to be a service or facility furnished by the chains to petitioner, then, under the Commission's interpretation of the Act, the failure of petitioner to designate products would not have exonerated petitioner from a § 2(d) violation.

4. Section 2(e) of the Clayton Act, 15 U.S.C.A. § 13(e), reads:
   "(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

5. Section 2(a) of the Clayton Act, 15 U.S.C.A. § 13(a) reads in part:
   "(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the

price discrimination in favor of the chains if the effect had been monopolistic or destructive of competition. For unlike § 2(d) which is aimed at reciprocal vendor-vendee benefits, §§ 2(a) and 2(e) are directed solely against unilateral discriminations by a vendor.

If the Commission's conception of "benefit" is adhered to, the only way in which the petitioner could have escaped the toils of the Clayton Act during the period when the broadcasting companies were offering in-store promotions would have been either to forego completely advertising over the air through the broadcasting companies offering the promotions, or to buy air time for all of petitioner's customers on a basis proportionately equal to that on which the broadcasting companies had allotted air time to the chains. Petitioner would have found itself in this unhappy plight solely because of the contracts which the broadcasting companies made with the chains for which the petitioner was in no way responsible.

Carried to its logical limit, the decision of the Commission means that if a common supplier of a vendor and vendee, without pre-arrangement with the vendor, grants the vendee terms more favorable than the supplier has granted other customers of the vendor, the vendor must stop dealing with the supplier, give proportionately equal "benefits" to all of its other customers, or be adjudged guilty of Clayton Act discrimination. This result would follow regardless of how vital the commodities or services furnished by the supplier might be to the vendor. A construction of § 2(d) which carries within itself the seeds of consequences so harsh, unreasonable and oppressive should not be reached unless required by a clear Congressional mandate. This I am unable to discern.

The foregoing views are not at variance with the cases which the majority of the Court has cited. Herbert v. Shanley Co., 1917, 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511, and M. Witmark & Sons v. L. Bamberger & Co., D.C.D.N.J.1923, 291 F. 776 involved constructions of the Copyright Act. Pittsburgh Athletic Co. v. KQV Broadcasting Co., D.C.W.D.Pa. 1938, 24 F.Supp. 490, was concerned with principles of unfair competition and the Communication Act of 1934 in their relationship to interference with a contractual right to broadcast baseball games. These decisions are scarcely pertinent to a determination whether petitioner's payments to the broadcasting companies were a "benefit" to the chains within the purview of the Clayton Act. To the extent that State Wholesale Grocers v. Great Atlantic & Pacific Tea Company, 7 Cir., 1958, 258 F.2d 831, may have application, it tends to refute rather than to support the decision of the Commission.

It may be that the sales promotional plan of the broadcasting companies is economically undesirable and that the broadcasting companies which sponsored it are beyond the reach of the present law. But this is no reason for making a whipping boy out of petitioner by affirming the far-fetched conception of Clayton Act "benefit" which the Commission has adopted.

Judicial responsibility requires that a Court which sits in review of an administrative order shall interpret the applicable statute and hold unlawful and set aside any agency action not in accordance with law, 5 U.S.C.A. § 1009(e). In the fulfillment of that responsibility, I would set aside the order of the Commission in each case and direct a dismissal of the complaints.

District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: * * *"