SWANEE PAPER CORPORATION,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 161, Docket 26311.

United States Court of Appeals
Second Circuit.

Argued Jan. 12, 1961.

Decided June 22, 1961.

834

Arnold A. Jaffe, New York City (Moses & Singer, Joseph L. Fishman, New York City, on the brief), for petitioner.

E. K. Elkins, Attorney, Federal Trade Commission, Washington, D. C. (PGad B. Morehouse, Acting General Counsel, Alan B. Hobbes, Asst. General Counsel, Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before CLARK, MAGRUDER and MOORE, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

Petitioner, Swanee Paper Corporation (Swanee), seeks to review a cease and desist order issued by the Federal Trade Commission (Commission) after proceedings in which Swanee was found to have violated Section 2(d) of the Clayton Act, as amended, 15 U.S.C.A. § 13 (d).[1] These proceedings were conducted upon a stipulation of facts with annexed exhibits which were submitted by the parties to the hearing examiner.

The dispute arose out of a series of arrangements involving Swanee, a manufacturer of paper products; The Grand Union Company (Grand Union), a customer of Swanee operating a number of retail food stores; and Douglas Leigh, Inc. (Leigh), the owner and operator of a "spectacular" advertising sign located in the Times Square area of New York City. This sign contained panels for stationary displays, and a panel (known as the "Epok Panel") which consisted of a bank of timed electric lamps against a black background, used for projection and display of animated advertisements.

On August 6, 1952, Grand Union accepted a proposal by Leigh offering "the use and occupancy of our combined electric spectacular and animated display located at 1552–1554 Broadway." In return, Grand Union agreed to pay to Leigh $50.00 and to secure "the agreement and consents of fifteen (15) participating advertisers to use the south panel animated part of the display * * for advertising on this display." These "participating advertisers" each were to pay Leigh $1,000 per month for the use of the Epok Panel for seventy-five per cent of its operating time. The remaining twenty-five per cent was reserved for advertising of Grand Union or its designates; one stationary panel was to be used for advertising by Grand Union; and the remaining space was to be developed in accordance with layout and copy plans prepared by Leigh for the approval of Grand Union. No design, layout or copy could be used on any portion of the display without the approval in writing by Grand Union. The term of the agreement was one year with Grand Union having the option to renew for two additional one-year periods. On August 20, 1953, the agreement was renewed and modified to the extent of increasing the number of participating advertisers from 15 to 20, eliminating Grand Union's twenty-five per cent participation on the Epok Panel, and requiring the payment to Grand

1. This section provides:
"It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

Union of five per cent of the monthly rental paid by the first 15 participating advertisers and all of the rentals paid by the additional 5 participants. On December 13, 1954, the agreement was again renewed and Grand Union was given an option to renew, one year at a time, through 1960.

Following conferences, conversations and correspondence between its representatives and those of Grand Union and Leigh, Swanee, on July 30, 1952, agreed in writing with Leigh to become one of the participating advertisers on the Epok Panel. This contract recited that Swanee "agrees to undertake a participation in the Advertising Service arranged for and to be rendered to the Grand Union Company by Douglas Leigh, Inc."; that Grand Union had leased the sign from Leigh; that the contract would become null and void in the event that Grand Union did not secure 15 signed contracts from participating advertisers; that each such advertiser would be entitled to display its copy on the Epok Panel for one minute during each twenty minutes of operation; that all advertising copy used by Swanee was to be approved by Grand Union; and that Swanee would pay to Leigh $1,000 per month "for full service rendered under this Agreement by Douglas Leigh, Inc." As part of the discussions with Grand Union concerning the above agreement, a schedule of in-store promotions of Swanee's products was arranged with Grand Union to tie in with the use of the sign. No separate payments were made by Swanee for these promotions.

In November, 1953, Frederick Gash, Swanee's broker, wrote letters to Swanee and Grand Union in which he analyzed the results of Swanee's participation in the "Broadway Sign deal." He reported that Grand Union "is the costliest account that * * * [Swanee] had on its books"; that the account "is too costly for the amount of business" being done; and that Swanee's purpose "should be *not* to cut down on the amount of money being appropriated for this account, but to find a solution so that we can do sufficient business to justify the expense."

About a month later, Swanee advised Leigh that it did not intend to renew its participation in the sign deal, and Leigh, in notifying Grand Union of this, suggested that the latter might be successful "in securing a reversal of this decision." After discussions with Leigh and Grand Union, Swanee, on February 16, 1954, renewed its participation for another year. In 1955 Swanee notified Grand Union that, " 'because of pressure from other concerns' including customers of * * * [Swanee] competing with Grand Union, it would be unable to renew its participation on the sign." However, following further discussions with Leigh and Grand Union, Swanee, in February, 1956, executed a new agreement. This contract differed from the earlier one in that all references to Grand Union were omitted, as were the provisions stating that Grand Union had leased the sign, that all copy was to be approved by Grand Union, and that the agreement was conditioned upon Grand Union's securing contracts from participating advertisers. Swanee's participation was canceled on December 31, 1956, and has never been renewed since that date. On November 6, 1957, these proceedings were commenced.

■ Section 2(d) of the Clayton Act makes it unlawful for a supplier, in the course of commerce, to pay anything of value "to or for the benefit of a customer * * * as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the * * * sale, or offering for sale * * *" of the supplier's products, "unless such payment or consideration is available on proportionally equal terms to all other * * *" competing customers of the supplier. There being no dispute that the payments made by Swanee to Leigh were not available on a "proportionally equal" basis to other customers of Swanee, the crucial questions on this appeal

are whether the record as a whole supports the Commission's conclusions that the payments were "for the benefit" of Grand Union, and that these payments were made in consideration of services rendered to Swanee "by or through" Grand Union.

Although the payments by Swanee were not made directly to Grand Union, it is clear that they were "for the benefit" of that company, within the meaning of Section 2(d). As the hearing examiner found, these benefits included valuable advertising space on the sign at a nominal cost, valuable advertising in other media in exchange for Grand Union's right to a twenty-five per cent participation on the Epok Panel, and cash payments totaling $14,633.28. And Grand Union's right to these benefits was not unqualified, but was entirely dependent upon the willingness of Swanee and other suppliers to become participating advertisers. That Leigh and Swanee also benefited from these payments does not make the benefit to Grand Union any the less. There may be situations where payments by a supplier to a third person indirectly benefit a customer of the supplier and yet are not "for the benefit" of the supplier within the meaning of Section 2(d).[2] Such is not the case where, as here, the benefit is wholly dependent upon the payment, and the customer is one of the moving and essential parties to the entire transaction.

■ Swanee urges that no Section 2(d) violation can exist here since it did not have knowledge that Grand Union was benefiting from the payments, and without such knowledge its acts were lawful. We need not decide the latter question, for the record fully supports the Commission's conclusion that Swanee knew or should have known that it

was benefiting Grand Union. It is true that the parties have stipulated that Swanee had no knowledge of the terms of the arrangement between Leigh and Grand Union except as reflected in the 1952 contract between Leigh and Swanee; it may also be true that Swanee did not know the exact terms of the Grand Union-Leigh contract. It did know, however, that Grand Union had leased the entire sign, that all advertising thereon was subject to the approval of Grand Union, and that the success of the Epok Panel arrangement was dependent upon Grand Union's ability to secure participating advertisers. It was also fully aware that the sign was being referred to as a "Grand Union sign," and a "new cooperative outdoor advertising program";[3] certainly the sign's appearance cried out that it was a Grand Union sign. When Swanee concluded that its "Grand Union account" was too costly, it decided to attempt to increase its business with that company rather than cut down on the money appropriated to the account. This permits of an inference that Swanee considered that it was conferring benefits upon its customer for which it was not being fully compensated. Finally, the deletion of all references to Grand Union in the 1955 renewal contract between Leigh and Swanee—executed only a short time after Swanee had complained of pressures from its other customers—supports the view that Swanee was not totally unaware of the legal significance of the arrangement.

■ Turning to the question as to whether the payments by Swanee were made in consideration of services or facilities rendered "by or through" Grand Union, the Commission's conclusion that they were so made is fully supported

---

**2.** See P. Lorillard Co. v. F. T. C., 3 Cir., 1959, 267 F.2d 439, 448 (dissenting opinion).

**3.** On November 28, 1952, Grand Union issued a press release announcing a "new venture in cooperative advertising * * * to promote Grand Union and 15 different food products." And in February, 1953,

Swanee received a copy of a brochure, prepared by Leigh without Swanee's authority, referring to the sign as a "Grand Union Spectacular and containing reprints of a number of newspaper articles which referred to the sign as a Grand Union Sign" or as a part of a "new cooperative outdoor advertising program."

by the record. There is no dispute that Swanee received valuable advertising in consideration for the payments. And it is clear that these facilities were furnished by Grand Union since it had leased the entire sign from Leigh and had the right to select the participating advertisers. Also, as part of the arrangement, in-store promotions of Swanee's products were provided by Grand Union. That Grand Union was not bound by contract to supply these promotions is not determinative, the crucial question being what actually was supplied. See P. Lorillard Co. v. F. T. C., 3 Cir., 1959, 267 F.2d 439, certiorari denied 361 U.S. 923, 80 S.Ct. 293, 4 L. Ed.2d 240.

The Commission was justified in relying on P. Lorillard Co. v. F. T. C., supra (referred to as the Chain Lightning case), where the Third Circuit upheld a finding of a Section 2(d) violation arising out of a series of transactions not dissimilar from that found here. In Chain Lightning certain grocery chains signed contracts with various broadcasting networks whereby the chains were given "free" broadcasting time in consideration of promises to furnish in-store promotional displays of various products. The products were not named in the contracts, the broadcasting companies agreeing to proffer suggestions at a later date with the chains reserving the right to decline to promote unsuitable products. Following the negotiations of these contracts, the networks solicited suppliers of the chains to purchase radio or television time, and to induce such purchases, offered promotions of the suppliers' products in the stores of the retail chains. The Commission held that the entire arrangement was part of a plan whereby the supplier's payments to the networks provided the chains with "free" advertising, and were partially made in return for the in-store promotions. Swanee's attempt to distinguish

Chain Lightning is not persuasive. In fact, athough we consider it unnecessary to approve or disapprove of that decision, it can be said that the Commission's case here is, in many respects, in a stronger position on its facts than it was there. In Chain Lightning the "execution of the agreements by * * * [the supplier] was not a contingency upon which the right of the chains to air time depended," the latter's right thereto being "fixed, immediate and unqualified" (267 F.2d 446 [dissenting opinion]). Here, however, Grand Union's right to advertise on the sign pursuant to its contract with Leigh was wholly conditioned upon the willingness of its suppliers to become participating advertisers. And in Chain Lightning the consideration received by the supplier only partially and indirectly flowed from the customer, the right to air time being supplied by the networks and available with or without the added inducement of in-store promotions. Here, however, Swanee's right to advertising space and even its choice of copy was entirely subject to the approval of Grand Union.

 Although the Commission's finding of a Section 2(d) violation is supported by the record, the breadth of the order issued is not justified by the facts. Administrative agencies have wide discretion in framing their orders and are empowered to enjoin other related unlawful acts which may occur in the future (e. g., F. T. C. v. Mandel Brothers, Inc., 1959, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893), but there must be some relation between the facts found and the breadth of the order. F. T. C. v. Mandel Brothers, Inc., supra; F. T. C. v. National Lead Co., 1957, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438; N. L. R. B. v. Express Pub. Co., 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930; N. L. R. B. v. Crompton-Highland Mills, Inc., 1949, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320.[4] Nothing in the record

4. See also 2 U.S.Cong. & Admin.News, p. 1807 (1959) where the report of the House Committee which studied the recent enforcement provision of the Clayton Act, 15 U.S.C.A. § 21, stated that the Commission should "make a continuous effort to issue orders that are as definitive as possible" and that deficiencies in this regard may be corrected by judicial review.

here indicates flagrant or extensive violations of Section 2(d) by Swanee; the single violation found occurred in an uncertain area of the law and was discontinued before the complaint was filed. Moreover, the order is not even limited to related activities but enjoins Swanee from violating Section 2(d) in the very words of the statute. As the Supreme Court stated in N. L. R. B. v. Express Pub. Co., supra:

"The mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged." 312 U.S. at page 435, 61 S.Ct. at page 699.

It is true that Swanee did not object to the order during the proceedings below and that orderly appellate review of administrative decisions usually requires that such objections be made. See United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54. Swanee did object to the order, however, in its petition to review, and at the time this was filed, the Commission could have modified its order if it had so wished. See 15 U.S.C.A. § 21(b). Moreover, the order as written is so broad that, under the new enforcement provisions of the Clayton Act (15 U.S.C.A. § 21), the duty of enforcing the prohibitions of Section 2(d) as to Swanee is shifted from the Commission to the federal courts, which may in the future be forced to decide the very issues that Congress has entrusted the Commission to determine. See F. T. C. v. Morton Salt Co., 1948, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196. Proper ju-

dicial administration requires that the order be modified,[5] and we therefore hold that the order should be limited to the particular practice found to violate the statute.

The decision of the Commission is affirmed; an order shall be entered in conformity with this opinion, pursuant to Rule 13(l), Rules of the United States Court of Appeals for the Second Circuit, 28 U.S.C.A., which provides that the Commission "shall within 10 days serve upon the * * * [petitioner] and file with the clerk a proposed decree in conformity with the opinion," and that if petitioner "objects to the proposed decree as not in conformity with the opinion he shall within 5 days thereafter serve upon * * * [the Commission] and file with the clerk a proposed decree which he deems to be in conformity with the opinion."

---

5. See N. L. R. B. v. Express Pub. Co., supra, where the Supreme Court modified an NLRB order notwithstanding the failure of the party affected thereby to object. See also N. L. R. B. v. Ochoa Fertilizer Corp., 1 Cir., 1960, 283 F.2d

26, certiorari granted 1961, 365 U.S. 833, 81 S.Ct. 746, 5 L.Ed.2d 743; Henry Broch & Co. v. F. T. C., 7 Cir., 1960, 285 F.2d 764, certiorari granted 1961, 81 S.Ct. 1350.