The NUARC COMPANY, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 13926.

United States Court of Appeals
Seventh Circuit.

April 19, 1963.

Herbert L. Nudelman, Eli E. Fink, Chicago, Ill., for petitioner.

J. B. Truly, Asst. Gen. Counsel, Thomas F. Howder, Atty., James McI. Henderson, Gen. Counsel, Alvin L. Berman, David B. Morris, Attys., F. T. C., Washington, D. C., for respondent.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

We are asked to review a cease and desist order issued by the Federal Trade Commission, in a proceeding charging petitioner, The Nuarc Company, with having violated Section 2(d) of the Clayton Act, as amended by the Robinson-Patman Act.[1]  15 U.S.C. § 13(d).

█ The question is: Does Section 2(d) prohibit a supplier of products and commodities from advertising in an advertising medium which is owned, controlled, and operated by one who also owns, controls and operates a business that is a customer of the supplier if the advertising medium prints advertising on equal terms for competitors of the supplier and also the customer, and neither indicia in the publication nor method of its distribution suggests to the public the nexus between the publication and the customer, and further if there is no evidence that fair, non-discriminatory advertising rates paid the publication by the supplier were intended to, or did, benefit the customer *qua* customer, or that the advertising benefited the customer more than it did the customers' competitors?

The basic facts are not in dispute. They may be summarized as follows.

Petitioner, The Nuarc Company, an Illinois corporation, is engaged in the manufacture and distribution of equipment used in printing, offset printing, and lithography. Its products include carbon arc lamps, light tables, dark room lights, and many similar items. Total sales for its 1959 fiscal year exceeded $1,200,000. Petitioner markets its products nationwide through approximately four hundred dealers on a non-exclusive basis.

Foster Type and Equipment Company, Inc., a Pennsylvania corporation, is located in Philadelphia. Since 1955, it has engaged in retailing printing equipment and supplies. It is a Nuarc dealer, reselling petitioner's products in the Philadelphia-New Jersey trade area. It purchased over $11,000 of such products from petitioner in 1958, and almost $9,000 in 1959. Nuarc's total sales in that area approximated $80,000 and $220,000 for those years respectively.

Foster Publishing Company, Inc., is also a Pennsylvania corporation located in Philadelphia. It was organized in April, 1958, and is engaged in publishing a monthly trade paper called "Printing Impressions." There is a national edition of this paper as well as a separate edition called "Printing Impressions-Delaware Valley Edition" intended only for local circulation in the Delaware Valley area. Nuarc advertised only in the national edition. In August, 1959, Foster Publishing Company changed its corporate name to "North American Publishing Company."[2]

Until May 1, 1959, Irvin J. Borowsky was president and sole stockholder of Foster Type. His wife and brother were secretary and vice-president respectively. On or about May 1, 1959, Hans Weiss became vice-president and secretary and Stephen Mucha became a vice-president. On August 1, 1959, Weiss was assigned

1. 15 U.S.C. § 13(d) reads:
"(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment, or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

2. Throughout this opinion the names Foster Publishing and North American Publishing are used interchangeably.

10% of the stock, Borowsky retaining 90%. Borowsky has always been president, treasurer, and sole stockholder of Foster Publishing. His wife is the secretary of that company.

In May, 1958, Borowsky circulated letters to suppliers, including Foster Type, soliciting advertising in "Printing Impressions." [3] The evidence shows that the recipients of these letters, including Nuarc, were disturbed by their contents and that Nuarc refused to place any advertising in "Printing Impressions" until the policies enunciated in the letters had been changed by Foster Publishing Company.

It is undisputed that since June, 1958, commencing with the first national edition of "Printing Impressions," and in each edition published monthly thereafter, "Printing Impressions" accepted advertisements from all competitors of Foster Type as well as all suppliers of competitors of Foster Type, charged standard advertising rates to Foster Type, and received full payment from Foster Type for all such advertisements. "Printing Impressions" did not identify itself anywhere in the publication as being in any way associated with Foster Type. In fact, the name of Foster Type appeared in "Printing Impressions" only in paid advertisements of Foster Type and never appeared in the ads placed by Nuarc. Foster Type and Equipment Company, Inc. and North-American Publishing Co., filed separate tax returns, maintained separate payrolls, books, and records, leased separate space, and loaned no funds or employees to each other.

3. The first letter read in part:
"* * * The reader and advertiser response to our first issue of PRINTING IMPRESSIONS has exceeded my most optimistic expectations.
* * * * *
"After a temporary retirement from the publishing business (sold TV Guide Magazine in 1953) I devoted full time to developing our Foster Printing Equipment Companies to the point where we now have a sales organization of 28 men and women.
* * * * *
"PRINTING IMPRESSIONS was started for the purpose of diversifying our present operation and as a cooperative means of furthering our printing equipment business and the manufacturers we represent.
"Advertising will not be accepted from anyone competitive to our equipment company, or from manufacturers we do not represent and are in competition to the line we sell in our Foster Type & Equipment Co.
"This is a full time business. We have taken additional space in an adjoining building and engaged a capable editorial staff. Our investment alone in mailing equipment and list development is over $15,000.00!
* * * * *
"I would prefer to present our publishing plans in person, but due to the problem of distance, I will outline briefly how we can help you sell more NuArc products.
* * * * *

"As a bonus, your ads appearing in our national edition will be reprinted at no cost to you, in some of our local editions under our printing logo of Foster Type & Equipment Co., similar to Lanston Monotype and ATF ads.
"This is good for both of us and we want to represent successful manufacturers. Both of us will benefit from the business we can get for you in our local area.
"Furthermore, every dollar you spend in our publication, we will have our Foster Type & Equipment Co. buy back in your products as a NuArc display.
* * * * *
"Sincerely,
"PRINTING IMPRESSIONS
"I. J. Borowsky, President"
Borowsky's "follow-up" letter a week later read in part:
"In these 'tight money' times our proposal to buy back every dollar you spend in advertising should be most beneficial to you.
"We will certainly have to sell your products, otherwise we will not be able to meet our $5000.00 per month publishing costs.
"Our first national edition is being prepared and already we have a number of prominent national companies represented.
"May I hear from you soon?
"Cordially,
"FOSTER PUBLISHING CO.
"I. J. Borowsky, President"

In January, 1959, six months after "Printing Impressions" commenced publication and some seven months after the above mentioned letters were sent, Nuarc placed its first advertisement in the national edition of "Printing Impressions." From January, 1959, through February, 1960, Nuarc placed fourteen monthly advertisements of its products in "Printing Impressions" at standard advertising rates and paid North American for said advertisements a total of $3,290. In 1959, Nuarc advertised in seventeen different trade publications at a total cost of more than $32,000.

The Commission found that during the period January 1, 1959, to February 1, 1960, Nuarc did not offer or otherwise make available any advertising or promotional payments to any of its other customers in the same trade area who were reselling Nuarc products in competition with Foster Type. The Commission found as a fact that Borowsky so dominated Foster Type and Foster Publishing that neither was able to formulate policy independently, and that in practical effect the entire operation constituted but a single Borowsky enterprise. It found that Nuarc was put on notice of this fact by Borowsky's letters of May, 1958, and

that Nuarc could not in good faith have believed that these two corporations had attained separate and distinct identities prior to the commencement of Nuarc's advertising payments. The Commission further found that Nuarc's payments to Foster Publishing were payments to Borowsky's business as a whole, including the Foster Type segment thereof which purchased and resold Nuarc products.[4]

The Commission's contentions may be summarized as follows: (1) Section 2(d) absolutely forbids payments "to" a customer for advertising services unless similar payments, on proportionally equal terms, are made available to other customers competing in the distribution of the supplier's products or commodities. Viewed in this manner, the Commission urges that the question of "benefit" to the customer is immaterial. (2) Realizing that in order to support their first contention it is necessary that a showing be made that the payment was made directly or indirectly to a customer, the Commission equates and merges the identity of Foster Type and Foster Publishing in the person of Borowsky, the controlling stockholder of both enterprises.[5]

4. The case presently before this court is but one of a number of related proceedings instituted by the Commission. Similar Section 2(d) charges were issued against a total of five suppliers of Foster Type who purchased advertising in "Printing Impressions." All of these firms (except Nuarc) entered into consent settlements with the Commission resulting in the entry of cease-and-desist orders against them. Borowsky and his Foster corporations were also charged with knowingly inducing and receiving such illegal payments in violation of Section 5 of the Federal Trade Commission Act. That proceeding is still in the process of administrative litigation.

5. The opinion of the Commission reads in part:
"* * * We are persuaded that the record herein support a finding that Foster Type and Foster Publishing, despite their separate incorporation, did in fact constitute one enterprise and that their separate corporate identity

was fictitious. We further hold that this state of affairs was in effect during the period in which the payments challenged herein were made.

"The record establishes beyond a doubt that Borowsky, by two letters in May of 1958, soliciting advertisements for Foster Publishing's 'Printing Impressions,' documented the relationship between Foster Type and Foster Publishing and thereby in effect expressly informed respondent that the two corporations were to be considered as one for practical business purposes. Clearly, the proposals that competitors of Foster Type and its suppliers would not be permitted to advertise in 'Printing Impressions' and that Foster Type would reciprocate the supplier's expenditures for advertising with purchases of equipment equivalent to the amount of such advertisements compel the inference that Borowsky so dominated the two corporations that he was in a position to manipulate the operations of each so that either could be

We believe that the finding of the Commission relating to the identity of Foster Type and Equipment Company and Foster Publishing Company (North American Publishing Co.) is not substantiated by the record as a whole and, if permitted to stand, would lead to a result which is neither supported by case law nor consistent with the Congressional intent underlying the enactment of Section 2(d).

> maneuvered into a position where it would be forced to conduct its affairs in a manner not necessarily to its own best interest but rather to further Borowsky's business as a whole. The record herein, therefore, goes beyond the mere documentation of the fact that the same individual held office in both corporations or that these corporations were jointly owned by him. On the basis of this evidence, we hold that both corporations operated as an integrated enterprise or as the alter egos of Borowsky and that neither had an existence independent of him. Accordingly, on receipt of these letters, respondent could be under no illusion but that payment to one corporation was inevitably a payment to Borowsky or to his enterprise as a whole."

In the initial decision by the Hearing Examiner are found the following pertinent findings:

> "14. Respondent knew, or should have known, that the Foster Type and Equipment Company, Inc., the Foster Publishing Company, Inc., and/or its successor in name, North American Publishing Co., all continued to be under the management and control of Irvin J. Borowsky, as president, as well as under his proprietary control because of his 100% or majority interest in the capital stock of the foregoing corporations as hereinbefore set forth.
>
> "15. Respondent knew, or should have known, that there was no change in the mutually beneficial cooperative corporate relationship between the Foster Type and Equipment Company, Inc., and the Foster Publishing Company, Inc., or its successor in name, North American Publishing Co. following respondent's receipt of a letter dated May 19, 1958, heretofore quoted (in part), since the cooperative policy enunciated therein was never formally in writing or in evidenced practice.

In P. Lorillard Company v. F. T. C., 267 F.2d 439 (3rd Cir., 1959), the court, while analyzing a violation of Section 2(d) said:

> "The purpose of the section here involved was to eliminate all discriminations under the guise of payments for advertising or promotional services, and Congress employed language that would cover any evasive methods. This is made clear by the

> "16. Respondent knew, or should have known, that placing advertising with the Foster Publishing Company, Inc., and/or its successor in name, North American Publishing Co., was tantamount to the granting of advertising allowances to the Foster Type and Equipment Company, Inc., as evidenced in the May 19, 1958, letter received by respondent from 'Printing Impressions.'"

The final order issued by the Commission struck the above findings of the Hearing Examiner and substituted the following:

> "14. Their president and sole or majority stockholder, Irvin J. Borowsky, dominated Foster Type and Equipment Company, Inc., and Foster Publishing Company, Inc. to the extent that they were unable to formulate policy independently and their separate corporate identity was no more than a sham.
>
> "15. Respondent was put on notice that the two corporations in fact constituted one enterprise by Borowsky's letters of May 1958 (heretofore referred to in paragraph 11 of the Findings). The two corporations had not attained a true separate corporate identity at the time respondent's payments for advertising in Printing Impressions commenced and respondent must have been aware of that fact since it could not in good faith rely on the vague and uncorroborated statements documented by this record to the effect that the two corporations were independent of each other.
>
> "16. Since the corporate identities of Foster Publishing Company, Inc., and Foster Type and Equipment Company, Inc., were fictitious, a payment to the former was a payment to Borowsky's business as a whole including that segment thereof, Foster Type and Equipment Company, Inc., which purchased and resold respondent's goods."

statement of Congressman Utterback, chairman of the House conferees, in explaining Section 2(d) and (e), as follows:

" 'The existing evil at which this part of the bill is aimed is, of course, the grant of discriminations under the guise of payments for advertising and promotional services which, whether or not the services are actually rendered as agreed, results in an advantage to the customer so favored as compared with others who have to bear the cost of such services themselves. The prohibitions of the bill, however, are made intentionally broader than this one sphere, in order to prevent evasion in resort to others by which the same purpose might be accomplished, and it prohibits payment for such services or facilities, whether furnished "in connection with the processing, handling, sale, or offering for sale" of the products concerned.' " 80 Cong. Rec. 9418.

The record here demonstrates that Borowsky's initial plan, if carried out, without question would have violated Section 2(d). But this plan was frustrated immediately by potential advertisers, including Nuarc, who apparently recognized its inherent illegality. This initial illegal but aborted proposal did not forever cast Borowsky into the role of an incorrigible transgressor of the law. While subsequent arrangements similar to those with which we are presently concerned might be viewed with suspicion because of Borowsky's original illegal proposals, they are not necessarily illegal if the objective surrounding circumstances show them to be otherwise.[6] Nuarc did not begin advertising in a successful trade publication until the illegal plan had been abandoned *in fact*. There is no evidence in the record that supports a finding that the illegal proposals outlined in the letters mailed in May, 1958, were ever executed.[7]

Nuarc paid standard advertising rates —the same rates paid by its competitors and the competitors of its customer, Foster Type. The disjunction between

6. With deference to the Commission's expertise, we think it was unduly preoccupied with Borowsky's original illegal proposal. Nuarc would have nothing to do with that proposal. After it was abandoned, Nuarc placed advertising only in the national edition of "Printing Impressions" and refrained from advertising in the Delaware Valley edition. The Commission seems to infer that Borowsky's intention to put into operation a plan that would have violated Section 2(d) continues to taint the relationship of Nuarc with "Printing Impressions" and Foster Type despite evidence of complete abandonment of the proposal; and to hold that Nuarc, who refused to participate in the illegal proposal in the first instance, should nonetheless be penalized for later participating in a business arrangement which cannot be deemed violative of Section 2(d) except by suspicion emanating from past but frustrated bad motives of Borowsky, not Nuarc. Suspicion of an arrangement violative of Section 2(d) is no substitute for affirmative proof.

7. The admission of Lou Page, general manager of Foster Publishing, that a demand by a supplier for reciprocal purchases by Foster Type on the basis of the offers made in Borowsky's letters would be honored, shows a frame of mind in which businessmen would seek to maintain good will by standing by their word. The Commission concluded that this admission "compels the conclusion that the two corporations had not regained a viable identity of their own, which would, in the case of each concern, permit it to formulate policy in its own best interest. It is inconceivable that Foster Publishing could compel such performance by Foster Type if the two concerns were, in fact, independent of each other."

We fail to see how his voluntary admission gives rise to the invidious inference found by the Commission. In view of the other attempts to conform to the law, at least in outward appearance, it is conceivable, and more probable, that such a request by Page to Foster Type might have been refused. In any event, the situation never came about and we find the admission too slender a reed on which to predicate a substantive finding that Foster Type and Foster Publishing operated as one entity, or that the disjunction of the two enterprises was a mere subterfuge to evade the law.

Foster Type and Foster Publishing was sufficient to require Foster Type to pay the standard rates for any advertising it placed in "Printing Impressions."

■ We believe that Section 2(d) requires a showing that some benefit accrued to, or was intended to accrue to, the customer. All analogous cases have found this benefit to a customer *qua* customer either directly, or indirectly as an attempt to circumvent the policy underlying Section 2(d). See Swanee Paper Corporation v. Federal Trade Commission, 291 F.2d 833 (2nd Cir., 1961), cert. den. 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); P. Lorillard Co. v. F. T. C., 267 F.2d 439 (3rd Cir., 1959), cert. den. 361 U.S. 923, 80 S.Ct. 293, 4 L.Ed.2d 240 (1960); State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 258 F.2d 831 (7th Cir., 1958), cert. den. 358 U.S. 947, 79 S.Ct. 353, 3 L.Ed.2d 352 (1959).

The only benefit that could have possibly accrued to Foster Type was through the indirect route of profits from the printing business accruing to Borowsky —the owner of both enterprises. This, without more, cannot be the basis of a Section 2(d) violation. A contrary decision would operate as a compulsory divestiture for any owner of an advertising medium that also engaged in a separate enterprise selling products advertised in his publication. The evidence contradicts any inference that other indirect benefits were intended, or that Foster Type was permitted to shift some of its advertising costs to Nuarc. The nexus between Foster Type and "Printing Impressions" was not apparent to the buying public. Advertising in "Printing Impressions" benefited competitors of Foster Type that handled the advertised products just as much as it did Foster Type.

The record as a whole does not support a finding that Nuarc made a payment to or for the benefit of its customer, either directly or indirectly in the sense proscribed by Section 2(d). The Commission itself has recognized that a merchandising corporation may control an advertising medium through a subsidiary corporation; and that the advertising medium may sell advertising "to other persons, corporations or firms, including suppliers [of the parent corporation] * * * on television or radio programs which are not sponsored by [the parent corporation] and which do not advertise or promote [the parent corporation]." (bracketed material supplied.) United Cigar-Whelan Stores Corp., 53 F.T.C. 102, 1956 CCH Trade Reg. ¶ 26,137 (Consent Order).

While wo do not believe the Commission can render legal that which is illegal in fact, United Cigar demonstrates an inconsistency in the Commission's standards. The domination of a parent corporation over its wholly-owned subsidiary is at least equal to that of Borowsky over his two corporations.

The order is set aside.